# EXHIBIT 12

093867.0104A
PATENT 8,643,189

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

*In re* patent of:  Attorney Docket No.: 093867.0104A
Boon Yew Low et al.

U.S. Patent No.: 8,643,189

Issue Date: February 4, 2014  Examiner: Not Yet Assigned

Filing Date: July 17, 2012  Art Unit: 2826

For:  PACKAGED SEMICONDUCTOR
  DIE WITH POWER RAIL PADS

### REQUEST FOR *EX PARTE* REEXAMINATION
### OF U.S. PATENT NO. 8,643,189

Mail Stop "*Ex Parte* Reexam"
Attn: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir or Madam:

STMicroelectronics, Inc. ("ST" or "Requester") requests an *ex parte* reexamination of Claims 1-20 ("Challenged Claims") of U.S. Patent No. 8,643,189 for "Packaged Semiconductor Die With Power Rail Pads" (the "'189 Patent," EX1001), which issued on February 4, 2014 to Boon Yew Low et al. based on U.S. Patent Application No. 13/550,627, filed July 17, 2012. The '189 Patent is presently assigned to Chip Packaging Technologies, LLC ("CPT" or "Patent Owner," or

516594055.4

"PO"). The assignment is recorded in the U.S. Patent and Trademark Office ("USPTO") at reel/frame number 68541/0903.

This Request presents prior art references and analyses that are non-cumulative of the prior art that was before the Examiner during the original prosecution of the '189 Patent. This request thus raises substantial new questions of patentability (SNQs) over the original prosecution. Requester is not prohibited or estopped from making this Request. *See* 37 C.F.R. § 1.510(b)(6). As demonstrated herein, the submitted prior art renders Claims 1-20 unpatentable over these references, thus warranting reexamination of these claims. Requester therefore requests that an order for reexamination and an Office Action rejecting Claims 1-20 be issued.

### *Ex Parte Patent Reexamination Filing Requirements*

In support of its request, Requester provides the following:

Pursuant to 37 C.F.R. § l.510(b)(l), statements pointing out each SNQ based on material, non-cumulative reference patents and printed publications for the Challenged Claims (Claims 1-20) of the '189 Patent are provided in Section II and III of this Request.

Pursuant to 37 C.F.R. § l.510(b)(2), reexamination of the Challenged Claims (Claims 1-20) of the '189 Patent is requested, and a detailed explanation of the

516594055.4                                ii

pertinence and manner of applying the cited references to the Challenged Claims is provided in Sections II and III of this Request.

Pursuant to 37 C.F.R. § 1.510(b)(3), copies of every patent or printed publication relied upon or referred to in the statement pointing out each SNQ or in the detailed explanation of the pertinence and manner of applying the cited references are provided as EX1005-EX1008   forming the basis for the SNQs presented herein) of this Request.

Pursuant to 37 C.F.R. § 1.510(b)(4), a copy of the entire '189 Patent, including the front face, drawings, and specification/claims is provided as EX1001 of this Request, along with a copy of any disclaimer, certificate of correction, and reexamination certificate issued corresponding to the patent.

Pursuant to 37 C.F.R. § 1.510(b)(5), the attached Certificate of Service indicates that a copy of this Request, in its entirety, has been served on Patent Owner at the following address of record, in accordance with 37 C.F.R. § l.33(c):

C. Tumey Law
PO Box 890226
Houston, TX 77062-9998
UNITED STATES

The Certificate of Service further indicates that a copy of this Request, in its entirety, is being served on PO at the following electronic addresses of its counsel in related district court litigation:

Garland Stephens
Garland@bluepeak.law

Robert Magee
Robert@bluepeak.law

Justin Constant
Justin@bluepeak.law

Richard Koehl
Richard@bluepeak.law

Kate Falkenstien
Kate@bluepeak.law

Heng Gong
Heng@bluepeak.law

Natalie Lieber
Lieber@bluepeak.law

Ameet Modi
Modi@bluepeak.law

Mark D. Siegmund
msiegmund@cjsjlaw.com

William D. Ellerman
wellerman@cjsjlaw.com

Pursuant to 37 C.F.R. § 1.510(b)(6), ST hereby certifies that the statutory estoppel provisions of 35 U.S.C. § 315(e)(l) and 35 U.S.C. § 325(e)(l) do not prohibit ST from filing this *ex parte* patent reexamination request.

Also submitted herewith is the fee set forth in 37 C.F.R. § l.20(c)(2).

516594055.4                                            iv

# TABLE OF CONTENTS

**Page**

I.    STATEMENT UNDER 37 C.F.R. § 1.510(B)(1) POINTING OUT SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY ......................2

    A.    Introduction ................................................................................2

    B.    Other Proceedings ......................................................................4

    C.    The '189 Patent ..........................................................................4

        1.    State of the Art at the time of the '189 Patent (July 17, 2012) ..............................................................................4

        2.    The Disclosure of the '189 Patent .................................5

        3.    Claims of the '189 Patent For Which Reexamination is Requested ..................................................................18

        4.    '189 Patent Prosecution History ..................................25

    D.    Summary of SNQs Raised..........................................................30

II.   THE PRIOR ART REFERENCES, ARGUMENTS, AND EVIDENCE PRESENT SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY ........................................................................31

    A.    Summary of Art Relied on in this Proceeding ..................................31

        1.    Pape (EX1005)...........................................................31

    B.    The Cited References Present Substantial New Questions of Patentability..........................................................................31

    C.    Discretionary Denial under 35 U.S.C. § 325(d) Is Not Warranted ...............................................................................32

III.  DETAILED EXPLANATION UNDER 37 C.F.R § 1.510(B)(2) OF THE PERTINENCY AND MANNER OF APPLYING THE CITED PRIOR ART TO EVERY CLAIM FOR WHICH REEXAMINATION IS REQUESTED........................................................34

    A.    Claim Construction.....................................................................35

    B.    SNQ1 and SNQ2: Claims 1-20 are anticipated by Pape (SNQ1) or obvious over Pape (SNQ2) ........................................37

        1.    Claim 1 .....................................................................40

        2.    Claim 2 .....................................................................64

3.      Claim 3 ...................................................................................68

4.      Claim 4 ...................................................................................72

5.      Claim 5 ...................................................................................75

6.      Claim 6 ...................................................................................78

7.      Claim 7 ...................................................................................81

8.      Claim 8 ...................................................................................81

9.      Claim 9 ...................................................................................85

10.     Claim 10 .................................................................................87

11.     Claim 11 .................................................................................89

12.     Claim 12 .................................................................................91

13.     Claim 13 .................................................................................93

14.     Claim 14 .................................................................................95

15.     Claim 15 .................................................................................97

16.     Claim 16 .................................................................................98

17.     Claim 17 .................................................................................98

18.     Claim 18 .................................................................................98

19.     Claim 19 .................................................................................99

20.     Claim 20 ...............................................................................103

IV.    CONCLUSION.............................................................................103

**EXHIBITS**

| Ex. No.[1] | Description |
|---|---|
| EX1001 | U.S. Patent No. 8,643,189 to Boon Yew Low et al., "Packaged Semiconductor Die With Power Rail Pads," filed July 17, 2012, issued February 4, 2014 ("the '189 Patent") |
| EX1002 | Prosecution History of the '189 Patent |
| EX1003 | Declaration of Dr. Jeffrey C. Suhling |
| EX1004 | Curriculum Vitae of Dr. Jeffrey C. Suhling |
| EX1005 | U.S. Patent No. 7,489,023 to Heinz Pape, "Semiconductor Device Including a Semiconductor Chip with Signal Contact Areas and Supply Contact Areas, and Method for Producing the Semiconductor Device," filed February 27, 2006, issued February 10, 2009 ("Pape") |
| EX1006 | Tummala, R.R., et al., "Microelectronic Packaging – An Overview," Chapter 1, Microelectronics Packaging Handbook, Second Edition, 1997 |
| EX1007 | Pecht, M.G. and Nguyen, L.T., "Plastic Packaging," in the Microelectronics Packaging Handbook, 1997 |
| EX1008 | Lau, J. H., "A Brief Introduction to Ball Grid Array Technologies," Chapter 1 in Ball Grid Array Technology, 1995 |

---

[1] Citations to patents and patent publications are made to paragraph number, column and line number, or original page and line number, where available. Citations to non-patent literature herein are made to the original pagination where available.

## I.    STATEMENT UNDER 37 C.F.R. § 1.510(B)(1) POINTING OUT SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY

Requester requests reexamination of Claims 1-20 ("Challenged Claims") of the '189 Patent. This Request is accompanied by the declaration of Dr. Jeffrey C. Suhling, a professor of Mechanical Engineering at Auburn University, and an expert in the design, mechanics, and reliability of semiconductor packaging.

### A.    Introduction

As discussed in more detail below, the Challenged Claims of the '189 Patent were well-known in the prior art, and the prior art cited herein raise SNQs regarding these claims. EX1003, ¶31-34.

The prior art source relied upon herein is Pape. EX1005. The Examiner did not cite or consider Pape during prosecution of the '189 Patent and the grounds presented herein present substantial new questions of patentability as they anticipate and/or render obvious Claims 1-20 of the '189 Patent.

Semiconductor packages that use power rail pads have been known for many years before the '189 Patent. EX1003, ¶31. The '189 Patent purports to improve prior semiconductor packages by utilizing power rail pads on the semiconductor die that have a larger surface area compared to individual die connection pad surface areas. EX1001, 2:49-3:3, 3:33-4:16, Fig. 3. But use of such power rail pads was well-known for many years prior to the '189 Patent. EX1003, ¶32.

516594055.4                                    2

For example, Pape (EX1005) discloses a semiconductor device having two annular supply collective electrodes—each power rail pads—arranged on the active top side of a semiconductor chip. EX1005, 2:66-3:65, 7:45-8:51, Fig. 1; EX1003, ¶33. Each of the electrodes have a significantly larger surface area than the surface areas of signal contact areas and supply contact areas— each die connection pad surfaces— of the semiconductor chip. EX1005, 2:66-3:65, 4:11-25, 7:45-8:51, Fig. 1; EX1003, ¶33. Although Pape does not use the exact "in haec verba" language as the '189 Patent to describe the name of his power rail pads, Pape's disclosure confirms that his annular supply collective electrodes have the same function, purpose, and structure as the claimed "power rail pads." For example, Pape discloses that his annular supply collective electrodes are a "metal foil . . . adhesively bonded or soldered as a metal sheet or on a plastic carrier onto the top side of the chip" (EX 1005 3:30-35), while the '189 Patent's power rail pad "may be thin sheets of metal (or metal alloy) such as copper, cut to shape and size and mounted on the die connection pad surface 303 by an epoxy or other form of adhesive" (EX1005 4:10-16). As such, Pape's disclosure anticipates or renders obvious the claimed "power rail pad" along with the remaining elements of Claims 1-20.

Requester respectfully submits that SNQ1 and SNQ2, based on Pape, present SNQs that justify ordering reexamination of the '189 Patent.

### B.     Other Proceedings

The '189 Patent is the subject of one pending District Court case:

*Chip Packaging Technologies, LLC, v. STMicroelectronics, Inc.*, United States District Court for the Western District of Texas, Case No. 7:25-cv-00505-DC-DTG (the "WDTX litigation").

### C.     The '189 Patent

#### 1.     State of the Art at the time of the '189 Patent (July 17, 2012)

"[T]he knowledge of [a POSITA] is part of the store of public knowledge that must be consulted when considering whether a claimed invention would have been obvious." *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013). As discussed by Dr. Suhling, the POSITA would have at least: i) a bachelor-level degree in mechanical engineering, materials science, electrical engineering, or a related field and at least 3-5 years of experience in the design/development of semiconductor packages; ii) a Master's level degree in mechanical engineering, materials science, electrical engineering, or a related field and at least 1-3 years of experience in the design/development of semiconductor packages; or iii) a Ph.D.-level degree in mechanical engineering, materials science, electrical engineering, or a related field and at least some experience in the area of semiconductor packaging. Additional education could substitute for professional experience, and significant work experience could substitute for formal education. EX1003, at 37. The POSITA would have been familiar with the fundamental concepts of semiconductor

packaging, as well as the design and construction of the wirebonded and plastic encapsulated semiconductor devices addressed in the '189 patent. *Id.* In addition, the POSITA would have been familiar with the state of the art of such wirebonded and plastic encapsulated semiconductor devices in the 2012 timeframe of the filing of the '189 patent application, as presented in the following paragraphs.

As explained by Dr. Suhling, EX1006 (Tummala, R.R., et al., "Microelectronic Packaging – An Overview," Chapter 1, *Microelectronics Packaging Handbook*, Second Edition, 1997), EX1006 (Tummala, R.R., et al., "Microelectronic Packaging – An Overview," Chapter 1, *Microelectronics Packaging Handbook*, Second Edition, 1997) is a seminal reference appearing before the relevant 2012 timeframe of the '189 patent. EX1003, at 39. This publication demonstrates the high-speed nature of semiconductor package development during the 1970s, 1980s, and 1990s, and the continuous rapid evolution in packaging technologies required to increase functionality and reduce the size (semiconductor package footprint) of electronic products. EX1003, at 39.

The evolution of packaging technologies discussed in EX1006, 62-113 demonstrates that with the above-noted ordinary skill in the art, engineers were able to quickly make improvements and were well-versed in the technology and the various design choices available to them. EX1003, at 40. These included wirebonded and encapsulated semiconductor devices that are the subject of the '189 patent,

516594055.4                                                5

which incorporated either leadframes (e.g., plastic packaging technologies) or substrates (e.g., ball grid array technologies). EX1003, at 40. A list of leadframe-based plastic package developments underway in 1997 is given in EX1006, 88-89, Table 1-19. For example, the semiconductor industry was pursuing new molding materials, better process controls, improved leadframe manufacturing techniques to form more finer-pitch interconnections, and new leadframe materials. EX1003, at 40. Similarly, a list of substrate-based ball grid array (BGA) package developments underway in 1997 is given in EX1006, at 93-99. For example, the semiconductor industry was pursuing reduced I/O pitches through improvements in laminate-based substrate technology. EX1003, at 40.

Thus, a POSITA at the time of the alleged invention of the '189 patent would have had been generally familiar with the processes needed to manufacture plastic-encapsulated semiconductor components, including methods to attach semiconductor chips to lead frames and substrates, wirebonding techniques for interconnecting the semiconductor die to lead frames and substrates, and methods for forming leadframes and substrates. EX1003, at 41.

In addition to the overall microelectronics packaging overview provided in EX1006, there are additional important references in the timeframe before the '189 patent that focus in more detail on the design and manufacture of wirebonded and encapsulated semiconductor devices that incorporate either leadframes or substrates.

These include the chapter on "Plastic Packaging" by Pecht and Nguyen in the Tummala, et al. Handbook (EX1007; Pecht, M.G. and Nguyen, L.T., "Plastic Packaging," in the *Microelectronics Packaging Handbook*, 1997), as well as a chapter on Ball Grid Array technologies in the monograph by Lau, J. H. (EX1008; Lau, J. H., "A Brief Introduction to Ball Grid Array Technologies," Chapter 1 in Ball Grid Array Technology, 1995). These references also demonstrate that a POSITA in the 2012 timeframe of the '189 patent would have been well-versed in manufacturing processes for wirebonded and encapsulated semiconductor devices that incorporate either leadframes or substrates. EX1003, at 42.

The POSITA would have been familiar with the fundamental concepts of semiconductor packaging, as well as the design and construction of the wirebonded and plastic encapsulated semiconductor devices addressed in the '189 patent. EX1003, at 43. In addition, the POSITA would have been familiar with the state of the art of such wirebonded and plastic encapsulated semiconductor devices in the 2012 timeframe of the filing of the '189 patent application, as presented in the following paragraphs. EX1003, at 43.

Electronic packages provide the electrical and mechanical interfaces for a semiconductor chip to its external environment. EX1003, at 44. EX1006 explains that packaging has four major functions: "Signal distribution," "Power distribution," "Heat dissipation," and "Protection (mechanical, chemical, electromagnetic) of

components and interconnections." EX1006, 12. This same framework is relevant to the challenged claims because they concern how a packaged semiconductor die distributes power and signals between die-level connection pads and external package connections. EX1003, at 44.

Semiconductor packages are ubiquitous in modern society, being used in a wide range of applications including cellular phones, computers, automobiles, airplanes, remote controls, appliances, children's toys, etc. EX1003, at 45. Because they are so widely used, they are typically mass produced, and advanced manufacturing techniques have been developed to produce semiconductor packages efficiently, reliably, and in cost-effective ways. EX1003, at 45.

Before packaging, individual semiconductor devices are fabricated on semiconductor wafers using photolithographic and chemical processes. Silicon is the most commonly used semiconducting material, so that the word "semiconductor" is often replaced by "silicon" when discussing manufacturing of electronic products. EX1003, at 46. After fabrication, the semiconductor wafer is cut/diced into individual chips/die, and then tested and packaged. EX1003, at 46.

Pecht and Nguyen describe the chip passivation layer as "usually made of brittle glass films, such as silica ($SiO_2$), phosphosilicate glass (PSG), or silicon nitride ($Si_3N_4$)" and note that "there is no passivation in the bond-pad area." EX1007, 477–478. Adding this passivation layer is the last step in the fabrication of a

semiconductor die, and is thus the physical demarcation between the integrated circuitry and the packaging elements subsequently applied. EX1003, at 47. After wafer fabrication, the die is diced, die-attached, wirebonded, and then encapsulated (EX1007, 590–502, Table 10-39) — elements added during this post-die fabrication assembly are package-level elements, not integrated circuit nodes. EX1003, at 47.

During packaging, electrical connections between the chip and associated substrate or leadframe are first made using one of three interconnection technologies: wirebonding, Tape Automated Bonding (TAB), or solder bumping (flip chip). EX1006, 71-78; EX1003, at 48. EX1006 further explains that electronic equipment components and subassemblies have "two distinct sets of terminals"— signals and power—and that ground provides a neutral reference voltage. EX1006, 22-23 (stating that "[s]ignal interconnections typically constitute the majority of the conducting elements" while "[o]ther conductors supply power and provide ground or other neutral reference voltages."). Thus, before July 2012, a POSITA would have understood that semiconductor die and packages ordinarily distinguished signal/data connections from supply and ground connections, even if different references used different terminology for those structures. EX1003, at 48.

That conventional signal/power distinction also affected package electrical design, EX1006 explains that high-performance packaging uses more elaborate power and ground connections to keep electrical interference or noise at acceptably

low levels, and identifies objectives such as maintaining power-distribution integrity and providing adequate ground and power planes. EX1006, 23-25; EX1003, at 49. A POSITA therefore would have understood before July 2012 that reducing the number or length of supply interconnects, lowering inductance, and providing effective power/ground distribution were ordinary packaging design considerations. EX1003, at 49.

After connections are made between the chip and substrate or leadframe, further packaging processes (e.g., encapsulation) are performed to produce a standalone first-level semiconductor package or component. EX1003, at 50. As mentioned above, the first-level semiconductor package provides a means for connecting the semiconductor chip to the external *environment*. EX1003, at 50. This is normally done by connecting or interfacing the semiconductor package to other higher levels of electronic packaging such as printed circuit boards (second level), electronic racks and chassis (third level), etc. EX1003, at 50. Thus, a semiconductor package will typically contain external lands, legs, balls, or pins to electrically and mechanically connect it to its external environment. EX1003, at 50.

There are thousands of semiconductor package types in use, and these are normally grouped into package families or architectures of similar form factor. EX1003, at 51. As discussed by Tummala, et al. (*see id.* at 78-83), common form factors (as of the 1997 timeframe) included Dual In-Line Packages (DIPs), Pin Grid

516594055.4                                        10

Arrays (PGAs), Small Outline Packages (SOPs), Quad Flat Packs (QFPs), Leadless Chip Carriers (LCCs), Land Grid Arrays (LGAs), Ball Grid Arrays (BGAs), and Chip Scale Packages (CSPs), etc. EX1003, at 51. Within a particular packaging family, the sizing dimensions and Input/Output (I/O) connection counts of particular components are selected by individual manufacturers based on the needs of the consumer market, as well as often being defined by international, national, or industry standards. EX1003, at 51.

As explained by Dr. Suhling, wirebonded and encapsulated semiconductor devices are the subject of the '189 patent. EX1003, at 52. The patent specification discusses such devices where the chip is either mounted on a substrate (e.g., ball grid array technology) or on a leadframe (e.g., plastic packaging technology). EX1003, at 52. For example, the preferred embodiments in the '189 patent include substrate-based BGA/LGA form factors (EX1001, 3:24-40) and leadframe-based QFP form factors (EX1001, 5:42-63); EX1003, at 52. As discussed above and illustrated by EX1007 and EX1008, both categories were conventional before the July 2012 filing date. EX1003, at 52.

Wirebonding is the most common chip-bonding technology used in the semiconductor packaging industry. EX1003, at 53. As Tummala explains, "[w]irebonding is the most common chip-bonding technology, spanning the needs from consumer electronics to mainframes." EX1006, at 72. Pecht and Nguyen

describe the typical plastic package as consisting of "a silicon chip, a metal support or leadframe, wires that electrically attach the chip circuits to a leadframe which incorporates external electrical connections, and a plastic epoxy-encapsulating material to protect the chip and the wire interconnects. EX1007, 397 & Fig. 10-4 (reproduced below). They also explain that the chip is usually mounted to the leadframe and that wires are bonded to chip bonding pads and leadframe fingers." *Id.* The wires are "generally of gold but also of aluminum or copper" and "are bonded to the aluminum bonding pads on the chips and to the fingers of the leadframe." *Id.* A POSITA would have understood that using wire bonds to connect pads on a semiconductor die to a die support was an entirely conventional technique. EX1003, at 53. The claim elements reciting "die wire bonds," "data wire bonds," and "power rail wire bonds" are directed to the standard means of chip interconnection for plastic packages. EX1003, at 53.



**Figure 10-4. Typical Plastic Package Construction** (From Ref. 1.)

516594055.4

**EX1007, Fig. 10-4**

Leadframes are the most widely used die support structure for plastic-encapsulated packages. EX1003, at 54. Pecht and Nguyen explain that "[t]he leadframe is the backbone of a molded plastic package. Fabricated from a strip of sheet metal by stamping or chemical milling, it serves first as a holding fixture during the assembly process, then, after molding, becomes an integral part of the package." EX1007, 425. The leadframe performs multiple functions: holding fixture, dam for molding, chip attach substrate, support matrix, and electrical/thermal conductor. *Id.* at 425-26; EX1003, at 54. "Alloy 42 (42% Nickel–58% Iron)" was "the most widely used metal for leadframe fabrication." EX1007, 426. A POSITA would have understood Pape's interchangeable reference to a "flat conductor leadframe" as an alternative to "wiring substrate 27" (EX1005, 2:62–65, 3:13-3:24) to be entirely consistent with standard industry practice. EX1003, at 54. Both leadframes and substrates were well-established die support structures for plastic packages. EX1003, at 54. Accordingly, before July 2012, a POSITA would have been familiar with leadframe-based packages using die attach, bond wires, external leads, and encapsulation. EX1003, at 54.

EX1008 likewise illustrates that substrate-based BGA packages were conventional before July 2012. EX1003, at 55. For example, EX1008 describes a PBGA with gold wire, molding compound, a die pad, plated copper conductors, vias

for ground/signal and ground/thermal paths, a BT epoxy substrate, a solder mask, and solder balls. EX1008, Fig. 1.37; see also *id.* at 29-31; EX1003, at 55. Fig. 1.37 is reproduced below:



Figure 1.37    Plastic Ball Grid Array (PBGA).

**EX1008, Fig. 1.37**

Thus, a POSITA would have recognized substrate-based packages with wire bonds, vias, and external solder-ball connections as known options for implementing the type of packaged semiconductor die addressed by the '189 Patent. EX1003, at 56.

Plastic encapsulation was the universal final step in plastic package assembly for decades before the 2012 filing date. EX1003, at 57. Pecht and Nguyen explain that "during the 1970s, virtually all high-volume Integrated Circuits (ICs) were encapsulated in plastic." EX1007, 395. In the standard postmolded process, "the die is attached to a leadframe, which is then loaded into a multicavity molding tool and encapsulated in a thermoset molding compound via the transfer-molding process."

EX1007, 398. "[I]n the 1990s, about 90% of plastic packages were made using postmolding techniques." *Id.* In a postmolded package, the molding compound covers the die and all wire bonds. EX1003, at 57. The '189 patent itself describes this same standard process. EX1001, 5:12–19; EX1003, at 57.

Developmental improvements to these packaging architectures have continued to occur due to demands for reduction in semiconductor packaging size and improvement in package performance and reliability, as well as for increasing demand for high-volume and efficient manufacturing techniques. EX1003, at 58. For example, the industry largely has changed from using gold to using copper for the metals used in wirebonding. EX1003, at 58. This has both decreased raw material costs and increased electrical performance. EX1003, at 58. Although there have been developmental improvements in specific operations, equipment, and materials, the general processes for manufacturing wirebonded and encapsulated semiconductor devices were well-settled and conventional by the 2012 timeframe of the '189 patent. EX1003, at 58.

### 2. The Disclosure of the '189 Patent

The '189 patent is generally directed to a packaged semiconductor die having consolidated "power rail pads." EX1001, Abstract, 3:41-4:31, 7:4-13, Fig. 3. As described by the '189 Patent, "power rail pads" are thin sheets of metal, such as copper, mounted on the die connection pad surface by adhesive. *Id.* The purpose of

the "power rail pad" as described by the patent is to reduce the number of external power connections of the die to a circuit board. *Id*. at 1:12-45.

The patent explains that as semiconductor die functionality increases, semiconductor devices need more external connections to "connect to power rail pads, ground rail pads and data input and output pads of the die." *Id.* at 1:24-30. But, according to the '189 patent, this increase in connections can be problematic as it can cause an increase in semiconductor die package size (also referred to as the package's "footprint"), stray capacitances, as well as possible noise. *Id.* at 1:30-45.

To address this problem, the patent's alleged invention utilizes power rail pads having a larger surface area compared to individual die connection pad surface areas. EX1001, 2:49-3:3, 3:33-4:16, Fig. 3. Figure 3 shows an example of this arrangement, where a first power rail pad 309 and a second power rail pad 310 are mounted on a die connection pad surface 303 of semiconductor die 301 (figure annotated to point out the power rail pad structures). *Id.*



**EX1001, Fig. 3 (annotated)**

According to the '189 Patent, by using such large power rail pads, the number of wire bond connections between the semiconductor die and the substrate or lead frame on which it is mounted is reduced, which shortens data wire bond connection lengths. EX1001, 7:4-10. Moreover, the footprint of the device, number of external connectors, potential stray capacitances and the possibility of noise induction can be reduced or alleviated. *Id.* at 7:10-13.

As is shown herein, the '189 Patent's alleged invention of using consolidated power rail pads to distribute power connections and reduce the number of external

connections was well known in the art, as demonstrated by the Pape reference. EX1003, ¶64; Sections II-III. The grounds of this reexamination request raises SNQs and demonstrate that the '189 Patent should never have issued. *Id.*

### 3. Claims of the '189 Patent for Which Reexamination is Requested

The following chart lists Claims 1-20 addressed in this Request, with the element-by-element breakdown used throughout the Request.

| Claim Number | Claim Element |
|---|---|
| | |
| **Claim 1** | |
| 1[p] | *A semiconductor die package, comprising:* |
| 1[a] | *a semiconductor die support having external connectors;* |
| 1[b] | *a semiconductor die mounted to the die support, the semiconductor die having a die support mounting surface attached to the die support and an opposite die connection pad surface with associated die connection pads, wherein the connection die pads are circuit nodes of the semiconductor die;* |
| 1[c] | *at least one power rail pad on the die connection pad surface, the power rail pad having a larger surface area than surface areas of the die connection pads; and* |

| | |
|---|---|
| 1[d] | *die wire bonds electrically coupling the power rail pad to at least two of the die connection pads.* |
| | |
| **Claim 2** | |
| 2[a] | *The semiconductor die package of claim 1, wherein the at least one power rail pad includes a first power rail pad and a second power rail pad each individually coupled by the die wire bonds to at least two of the die connection pads.* |
| | |
| **Claim 3** | |
| 3[a] | *The semiconductor die package of claim 2, wherein the die connection pads include positive voltage supply rail die connection pads, and wherein the die wire bonds electrically couple the first power rail pad to at least two of the positive voltage supply rail die connection pads.* |
| | |
| **Claim 4** | |
| 4[a] | *The semiconductor die package of claim 3, wherein power rail wire bonds directly electrically couple the first power rail pad to at least one of the external connectors.* |
| | |
| **Claim 5** | |

| | |
|---|---|
| 5[a] | *The semiconductor die package of claim 4, wherein the die connection pads include ground supply rail die connection pads and wherein the die wire bonds electrically couple the second power rail pad to at least two of the ground supply rail die connection pads.* |
| | |
| **Claim 6** | |
| 6[a] | *The semiconductor die package of claim 5, wherein power rail wire bonds electrically couple the second power rail pad to at least one of the external connectors.* |
| | |
| **Claim 7** | |
| 7[a] | *The semiconductor die package of claim 4, wherein the die connection pads include ground supply rail die connection pads and* |
| 7[b] | *wherein the die wire bonds electrically couple the second power rail pad to at least two of the ground supply rail die connection pads, and* |
| 7[c] | *wherein the power rail wire bonds electrically couple the second power rail pad to at least one of the external connectors.* |
| | |
| **Claim 8** | |
| 8[a] | *The semiconductor die package of claim 7, wherein the die connection pads are adjacent respective edges of the semiconductor die and* |

| | |
|---|---|
| | *include data input and output pads for the semiconductor die, the data input and output pads being electrically connected by data wire bonds to the external connectors.* |
| | |
| **Claim 9** | |
| 9[a] | *The semiconductor die package of claim 8, wherein the power rail wire bonds are least twice the diameter of data wire bonds.* |
| | |
| **Claim 10** | |
| 10[a] | *The semiconductor die package of claim 2, wherein the first power rail pad is a frame that encloses the second power rail pad.* |
| | |
| **Claim 11** | |
| 11[a] | *The semiconductor die package of claim 1, wherein the die connection pads are integral with the semiconductor die and wherein the power rail pad is a non-circuit node of the semiconductor die.* |
| | |
| **Claim 12** | |
| 12[a] | *The semiconductor die package of claim 1, wherein the semiconductor die support is a non-conductive substrate.* |

| | |
|---|---|
| **Claim 13** | |
| 13[a] | *The semiconductor die package of claim 1, wherein the semiconductor die support is a lead frame.* |
| | |
| **Claim 14** | |
| 14[a] | *The semiconductor die package of claim 1, further including an encapsulating material covering the semiconductor die and die wire bonds.* |
| | |
| **Claim 15** | |
| 15[p] | *A semiconductor die, comprising:* |
| 15[a] | *a die support mounting surface and an opposite die connection pad surface with associated die connection pads, wherein the die connection pads are circuit nodes of the semiconductor die; and* |
| 15[b] | *at least one power rail pad on the die connection pad surface, the power rail pad having a surface area larger than surface areas of the die connection pads,* |

| | |
|---|---|
| 15[c] | *wherein the die connection pads are integral with the semiconductor die and wherein the power rail pad is a non-circuit node of the semiconductor die.* |
| | |
| **Claim 16** | |
| 16[a] | *The semiconductor die of claim 15, wherein the least one power rail pad includes a first power rail pad and a second power rail pad, wherein the first power rail pad is a frame that encloses the second power rail pad.* |
| | |
| **Claim 17** | |
| 17[a] | *The semiconductor die of claim 15, further comprising die wire bonds electrically coupling the power rail pad to at least two of the die connection pads.* |
| | |
| **Claim 18** | |
| 18[a] | *The semiconductor die of claim 17, wherein the least one power rail pad includes a first power rail pad and a second power rail pad, each individually coupled by the die wire bonds to at least two of the die connection pads.* |

| | |
|---|---|
| **Claim 19** | |
| 19[p] | *A method for assembling a semiconductor die package, the method including:* |
| 19[a] | *providing a semiconductor die support with external connectors;* |
| 19[b] | *providing a semiconductor die with a die support mounting surface and an opposite die connection pad surface with associated die connection pads, the connection pads being circuit nodes of the semiconductor die, wherein there is at least one power rail pad on the die connection pad surface, the power rail pad having a surface area larger than surface areas of the die connection pads;* |
| 19[c] | *mounting the semiconductor die to the die support at the die support mounting surface;* |
| 19[d] | *electrically coupling the power rail pad to at least two of the die connection pads by die wire bonds;* |
| 19[e] | *electrically coupling the power rail pad to at least one of the external connectors by power rail wire bonds;* |
| 19[f] | *electrically coupling some of the die connection pads to the external connectors by data wire bonds; and* |

24

| | |
|---|---|
| 19[g] | *encapsulating the semiconductor die, power rail wire bonds, die wire bonds and data wire bonds.* |
| | |
| **Claim 20** | |
| 20[a] | *The method for assembling a semiconductor die package of claim 19, wherein the die connection pads are integral with the semiconductor die, and wherein the power rail pad is a non-circuit node of the semiconductor die.* |
| | |

### 4.    '189 Patent Prosecution History

The '189 Patent's underlying application, U.S. Patent Application No. 13/550,627 (the "'627 application"), was filed on July 17, 2012. EX1001, (21, 22); EX1002, 1-45. Claims 1-20 were presented to the Office for examination. EX1002, 24-28. The '189 issued February 4, 2014. EX1001, (45).

The Office issued a first non-final office action, rejecting claims 1-20 under 35 U.S.C. § 102(b) over U.S. Patent No. 5,641,878 ("Jassowski"). EX1002, 50-61.

In response, the applicants argued against the rejection without amending any of the claims. EX1002, 66-77. The applicants' arguments focused on the claim 1 element "*at least one power rail pad on the die connection pad surface.*"

To distinguish the prior art from the claimed "power rail pad," the applicants

argued that in the '627 application, "[a]s shown in FIG. 4 (reproduced below), the present invention is directed to a semiconductor die package 300 including a die support 100 having external connectors 101 and a die 301 mounted to the die support 100." *Id.* at 74 (parenthetical in original). The applicant continued, stating that "[t]he die 301 has a die support mounting surface 302 (i.e., bottom surface) that is attached to the die support 100 and an opposite die connection pad surface 303 (top, active surface) with associated die connection pads 304 and at least one power rail pad 309 or 310 on the die top surface 303." *Id.* (parentheticals in original).



FIG. 4

**EX1002, 72 (EX1001, Fig. 4)**

The applicants also stated that "[a]s shown in FIG. 6 (also reproduced below), the power rail pad 309 or 310 is electrically connected to the die connection pads 304 with bond wires 501." *Id.* (parenthetical in original).

**EX1002, 73 (EX1001, Fig. 6)**

The applicants then distinguished the claims from Jassowski, focusing on the "*at least one power rail pad on the die connection pad surface*"[2] element of claim 1 as noted above. Here, the applicants first stated that "Jassowski discloses an I/O buffer layout of a pad-limited die including a pad ring having four partially-overlapping I/O buffer arrays arranged in a pinwheel pattern at the periphery of a square die." EX1002, 73.

---

[2] Claim language is italicized, unless otherwise noted.



**EX1002, 73 (Jassowski, Fig. 2)**

The applicants asserted that they "disagree[d] that Jassowski discloses a power rail pad on the top surface of the die" and "[r]ather, the **power rails 121 of Jassowski are a part of the die** and are provided for linking I/O buffer circuits 118 to support the high current-drive capabilities of the I/O buffer circuits 118." EX1002, 74 (referring to Jassowski at 1:49-53) (emphasis added). The applicants continued, stating "[t]he **power rails are located inside the die and are formed during die fabrication**" and "[t]hat is, the **power rails, along with the I/O buffer circuits 118, are inside the die**." *Id.* (emphasis added). Due to this distinction between internal power rails and the "*pad surface*" requirement of claim 1, the applicants concluded that "Jassowski does not disclose '*at least one power rail pad on the die connection pad surface*,' which is recited in independent claims 1, 15 and 19." *Id.*

To support its argument, the applicants referred the Examiner to specific portions of the specification to interpret the "*at least one power rail pad on the die connection pad surface*" element of claim 1. The applicants stated that "[a]s illustrated in FIGS. 4 and 6 (reproduced above), and as recited in independent claims 1, 15 and 19, the semiconductor package 300 includes power rail pad 309 or 310 on the die connection pad surface 303, and the power rail pad 309 or 310 is electrically connected to the die connection pads 304 with bond wires 501." EX1002, 74. The applicants then pointed to paragraphs 0029 and 0027 of the specification in particular, stating "[n]ote that the specification of the present application specifically states at [0029] that '**the power rail pads 309, 310 are not integrated nodes of the circuitry within the semiconductor die 301**' and "at [0027] describes that the **power rail pads 309, 310 are mounted on the die surface and attached thereto with an adhesive**." *Id.* (emphasis added). Thus, the applicants concluded that "since Jassowski does not teach, suggest or disclose a semiconductor package having a power rail pad on the die connection pad surface, as recited in claims 1, 15 and 19, the present invention is not anticipated." *Id.*

The Office allowed the application in response. EX1002, 85-88. As for the reasons for allowance, the Office stated that the "prior art of record fails to show or collectively teach" the elements of the independent claims, and that "Applicant's arguments provide reason for allowance." *Id.* at 86-87.

But the Office did not have the benefit of the prior art utilized by the grounds herein that, along with the other recited elements in the claims, describe "*at least one power rail pad on the die connection pad surface*" as recited by the independent claims and interpreted by the applicants during prosecution. Pape specifically discloses that his "annular supply collective electrodes" are "metal rings made of a metal foil or a metal foil on a carrier that are **adhesively bonded or soldered** on in the inner region of the top side of the semiconductor chip" (*on the die connection pad surface*). EX1005, 6:3-6:10. Pape thus discloses the exact point of novelty the applicants used to distinguish Jassowski during prosecution, along with the other claimed limitations of Claims 1-20. As explained herein, the '189 Patent should not have issued had the Examiner had the benefit of Pape's disclosure during prosecution.

### D.    Summary of SNQs Raised

This Requests raises two SNQs of patentability:

| SNQ | Claims | Basis (35 U.S.C. §) | Prior Art |
|:---:|:---:|:---:|:---|
| 1 | 1-20 | 102(b), 102(e) | Pape |
| 2 | 1-20 | 103(a) | Pape |

## II.  THE PRIOR ART REFERENCES, ARGUMENTS, AND EVIDENCE PRESENT SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY

### A.    Summary of Art Relied on in this Proceeding

Reexamination of the Challenged Claims is requested in view of the following reference.

| Ex. | Description | 35 U.S.C. § | Prior Art Date(s) |
|-----|-------------|-------------|-------------------|
| **EX1005** | Pape | 102(b), 102(e) | Filed: February 27, 2006<br><br>Issued: February 10, 2009 |

This reference is not cited by the '189 Patent, and was not considered by the Examiner during prosecution of the '189 Patent. *See* EX1002. The absence from the prosecution record of this reference requires reexamination of the '189 Patent.

### 1.    Pape (EX1005)

U.S. Patent No. 7,489,023 ("Pape") (EX1005) was filed on February 27, 2006 and issued on February 10, 2009, both well more than one year before the '189 Patent's July 17, 2012 filing date.  Pape thus qualifies as prior art under at least §§ 102(b) and 102(e).

### B.    The Cited References Present Substantial New Questions of Patentability

This Request presents several SNQs for resolution. These SNQs are referred to using a reference number for convenience herein (e.g., SNQ1, SNQ2, etc.). The SNQs presented in this Request are the following:

- **<u>SNQ1 and SNQ2: Claims 1-20 are anticipated by Pape (SNQ1) or obvious over Pape (SNQ2).</u>**

Section III below details these SNQs and demonstrates why the Challenged Claims are unpatentable.

Requester submits that the prior art references cited herein raise new "substantial question[s] of patentability" because "the teaching of the (prior art) patents and printed publications is such that a reasonable examiner would consider the teaching to be <u>important</u> in deciding whether or not the claim is patentable." *See* MPEP § 2242 (9th ed. Rev. R-01.2024, Nov. 2024) (emphasis in original). While the original Examiner was unable to locate prior art that disclosed the challenged claims and based on the file history, they did not consider the prior art relied upon in this Request. That is, not only were the teachings of the cited references not before the Examiner, but references like these were not of record during the original examination.

## C.    Discretionary Denial under 35 U.S.C. § 325(d) Is Not Warranted

Discretionary denial is only warranted under § 325(d) when "the same or substantially the same prior art or arguments" were previously considered by the Office. 35 U.S.C. § 325(d). This Request does not present "the same or substantially the same prior art or arguments previously were presented to the Office." 35 U.S.C. § 325(d).

The prior art source relied upon herein is Pape. EX1005. Pape is new and is not cited by the '189 Patent. EX1001, Cover Page. As such, because this Request presents new art—not previously considered during prosecution of the '189 Patent—for SNQs 1 and 2, discussed in detail below, discretionary denial under § 325(d) is not warranted. *Becton, Dickinson & Co.*, IPR2017-01586, Paper 8 at 17 (considering "the extent to which the asserted art *was evaluated during examination*" when deciding whether discretionary denial is proper); *In re Sandelman et al.*, *Ex Parte* Reexamination Proceeding, Control No. 90/020,115, Denying Patent Owner's Petition to Vacate the Reexamination Order at 13 (June 15, 2018) ("[T]he purpose of ex parte reexamination is to permit the Office to reexamine the patent on the basis of prior art which was *not previously considered, or was not fully considered* with respect to the specific claims of the patent, during an earlier examination or review of the patent. There is a strong public interest that all of the prior art be considered.")

SNQs 1 and 2 present compelling grounds of unpatentability for the Challenged Claims, and Reexamination of the Challenged Claims should be ordered. For example, Pape discloses precisely the concepts that the applicants argued during prosecution and that the Examiner found persuasive along with the other elements of Claims 1-20. EX1002, 74, 79-82. Applicants argued that the prior art "power rails 121" failed to disclose the invention because the claimed power rail pads "are not integrated nodes of the circuitry within the semiconductor die." *Id.* at 74.

Pape specifically discloses "annular supply collective electrodes 14 and 15" (each an instance of the claimed "*power rail pad*"), which are not integrated nodes of the die, but rather are separately fabricated "metal rings made of a metal foil … that are adhesively bonded or soldered on in the inner region of the top side of the semiconductor chip" (EX1005, 5:65-6:2), and may be "soldered or adhesively bonded directly onto a semiconductor wafer *after* the individual integrated circuit elements have been produced on the semiconductor wafer" (*id.* at 6:47-51 (emphasis added)). Pape thus discloses that his annular supply collective electrodes (corresponding to the claimed "power rail pads") were not integrated circuit nodes of the die but are adhesively bonded *after* the integrated circuit elements are manufactured. Requester submits that an SNQ exists at least because Pape discloses the applicants' basis for allowance along with the remaining elements of the challenged claims.

## III. DETAILED EXPLANATION UNDER 37 C.F.R § 1.510(B)(2) OF THE PERTINENCY AND MANNER OF APPLYING THE CITED PRIOR ART TO EVERY CLAIM FOR WHICH REEXAMINATION IS REQUESTED

In the subsections below, this Request describes the proposed rejections (SNQs) listed above (*supra* § II.B-C) in further detail and demonstrates how Claims 1-20 of the '189 Patent are rendered unpatentable over the references noted above.

Requester notes that each of the proposed rejections below are based on novelty under 35 U.S.C. § 102 or obviousness under 35 U.S.C. § 103(a). Requester

516594055.4

34

notes that, even if there are minor differences between cited disclosures of the prior art and the claimed concepts, the claims are still obvious, as a POSITA would not have appreciated "some new synergy" or unexpected results from the limitations given the disclosures of the prior art and the general knowledge of a POSITA. *KSR Intern. Co. v. Teleflex Inc.*, 550 US 398, 417 (2007). When compared with the prior art described below and in light of the knowledge of a POSITA, any "differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103.

### A.    Claim Construction

For purposes of this *ex parte* reexamination, claim terms are given their broadest reasonable interpretation consistent with the specification. *See* 37 C.F.R. § 1.555(b); MPEP § 2111. Under the broadest reasonable interpretation, and equally under the *Phillips* standard applied in district court, the term "*power rail pad*" should be construed as "a conductive pad, not integrated with the die circuitry, that supplies power to circuit nodes of the die."

This construction is compelled by the intrinsic record. Claim 1 separately recites a plurality of "*die connection pads*" that "*are circuit nodes of the semiconductor die*" and "*at least one power rail pad on the die connection pad*

*surface*," confirming that the power rail pad is structurally and functionally distinct from the die's integrated die connection pads. EX1001, claim 1. Dependent claim 11 expressly recites that "*the power rail pad is a non-circuit node of the semiconductor die.*" *Id.* at claim 11. The specification reinforces this distinction, describing the power rail pads as "thin sheets of metal . . . cut to shape and size and mounted on the die connection pad surface . . . by an epoxy or other form of adhesive" (EX1001, 4:13-16) and stating that "the power rail pads 309, 310 are non-circuit nodes of the semiconductor die" and "are not integrated nodes of the circuitry within the semiconductor die" (*Id.* at 4:26-31).

The prosecution history confirms this construction. To overcome the Examiner's § 102(b) rejection over Jassowski, the applicant argued that Jassowski's on-die "power rails 121 . . . are a part of the die," are "located inside the die and are formed during die fabrication," and therefore do not disclose the claimed "power rail pad," which the applicant characterized as "mounted on the die surface and attached thereto with an adhesive." EX1002, 74. The Examiner allowed the claims based on these arguments. *Id.* at 79-88. These arguments made in favor of allowance confirm the meaning ascribed to this term in the '189 Patent. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323-26 (Fed. Cir. 2003).

Requester notes that the patent owner has apparently taken the position in the co-pending litigation that the claimed "power rail pad" may be broad enough to

include both integrated and non-integrated circuit nodes.  To the extent this is the case, Requester submits that the claims are invalid as presented herein whether the claims are construed according to the Patent Owner's apparent construction or as Requester contends.

### B.    SNQ1 and SNQ2: Claims 1-20 are anticipated by Pape (SNQ1) or obvious over Pape (SNQ2)

All limitations of Claims 1-20 of the '189 Patent are disclosed or rendered obvious in view of Pape. *See* EX1005. As an introduction, Pape (EX1005) discloses the same packaging concept claimed in the '189 Patent: oversized supply-distribution pads mounted on the active surface of a semiconductor chip that aggregate the chip's many power and ground supply connections and reduce the number of external supply wires required to leave the package. EX1003, at ¶78.

Pape's Figure 1 (reproduced and annotated below) discloses a semiconductor device 1 in which two "annular supply collective electrodes 14 and 15" (corresponding to the claimed "*power rail pads*") are "fixed in an electrically insulated manner on the top side" of semiconductor chip 4 and "function as potential busbars or current distributors" for the chip's supply potentials. EX1005, 2:59-3:65, 7:45-8:27; Fig. 1; EX1003, at 79.

516594055.4 37



**EX1005, Fig. 1 (annotated with power rail pad labeling)**

Pape discloses that in Figure 1, one of the electrodes 14 and 15 is provided for the supply (positive voltage) potential and in the other of electrodes 14 and 15 is provided for the ground potential. *See* EX1005, 3:13-24, 4:11-25 ("at least one of the supply collective electrodes is provided for a ground potential and another supply collective electrode has a supply potential"); 8:17-27. Requester has annotated Figure 1 above to illustrate an embodiment where electrode 14 is for the positive supply voltage and electrode 15 is for ground. *Id.*

Annular supply collective electrodes 14 and 15 function—and are described by Pape—in a manner that directly tracks the purpose and structural attributes of the '189 Patent's power rail pads. *First*, like the '189 Patent's power rail pads, Pape's electrodes 14 and 15 are not integrated with the die circuitry: they are separately fabricated "metal rings made of a metal foil . . . that are **adhesively bonded or soldered on in the inner region of the top side of the semiconductor chip**" (EX1005, 6:1-6 (emphasis added)), and may be applied "**directly onto** a semiconductor wafer **after** the individual integrated circuit elements have been produced on the semiconductor wafer." EX1005, 6:39-51 (emphasis added); *see also* EX1005, 3:25-35. This is strikingly similar to the '189's own description of its power rail pad, which states that the power rail pad "may be thin sheets of metal (or metal alloy) such as copper, cut to shape and size and mounted on the die connection pad surface 303 by an epoxy or other form of adhesive." EX1001, at 4:13-16. *Second*, like the '189 Patent's power rail pads, Pape's electrodes serve to consolidate the chip's many on-die supply connections so that fewer external supply wires are required to exit the package: Pape teaches that "most of the supply contact areas both for the ground connection and for the power connection are connected by bonding or soldering contact connections in the direction of the annular supply collective electrodes" (EX1005, 3:48-52), such that "[o]nly a few bonding or soldering connections which extend beyond the [chip] to the flat frame or the wiring substrate

are required for application of the associated supply potential" (EX1005, 3:52-55), thereby "reduc[ing] the number of supply connections externally toward a substrate or toward a flat conductor leadframe" (EX1005, 2:62-65); *see* EX1001, 1:24-45, 7:4-13; EX1003, ¶82.

### 1. Claim 1

#### i. 1[p] A semiconductor die package, comprising:

To the extent the preamble is limiting, Pape discloses or at least renders obvious a semiconductor die package. *See* EX1005, 7:35-53, 8:52-9:49, Figs. 1-3; EX1003, ¶83. Pape discloses a "semiconductor device 1" having a "semiconductor chip 4 and [] wiring substrate 27" contained within a "plastic housing," forming *[a] semiconductor die package* as claimed. EX1005, 7:45-53, Fig. 1, Fig. 3; EX1003, ¶83. Pape's Figure 1 (annotated below) depicts the active top side of the semiconductor chip 4 and the wiring substrate 27 of semiconductor device 1, where the plastic housing is omitted from the figure "in order to better illustrate the invention." EX1005, 7:45-53, Fig. 1.



**EX1005, Fig. 1 (annotated)**

Pape's Figure 3 (annotated below) depicts an example of the plastic housing that encapsulates (packages) semiconductor device 1. EX1003, at ¶84. Figure 3 depicts a cross section of a semiconductor device having an encapsulating "semiconductor housing 25" that surrounds and encloses a semiconductor chip 4. EX1005, 7:35-53, 8:52-9:49, Figs. 1, 2, 3.



**EX1005, Fig. 3 (annotated)**

Figure 3 shows "**a semiconductor housing 25** in which **the semiconductor chip 4** with the supply collective electrodes 14 and 15 and also with the internal connecting elements 16 and the external connecting elements 12 is **embedded**." EX1005, 9:32-38 (emphasis added). Although Figure 3 is described with respect to Pape's Figure 2 embodiment, the POSITA would have understood or at least found obvious that (1) Pape's Figure 1 embodiment uses the same or similar packaging to package its semiconductor chip 4 and wiring substrate 27, and (2) Pape's Figure 3 depicts a cross-section of a semiconductor chip 4 within an encapsulating housing (identified by numeral 25) that would be the same or similar to a cross-section of semiconductor chip 4 in Figure 1, and shows that the semiconductor chip is mounted on top of wiring substrate 27. EX1005, 7:45-8:51, 9:32-49, Figs. 1-3; EX1003, ¶85. This is at least because Pape explains that its semiconductor chip 4 and wiring substrate 27 of Figure 1 are packaged in a "plastic housing" as discussed previously,

and that semiconductor chip 4 is located on top of wiring substrate 27, as shown by Figure 1. EX1005, 7:45-8:51, Fig. 1; EX1003, ¶85-87 (explaining that Figure 3 depicts the well-known plastic ball grid array (PBGA housing type, citing EX1008, at 30 (Figure 1.37)).

Pape therefore discloses or at least renders obvious the preamble. EX1003, ¶88.

### ii. 1[a]: a semiconductor die support having external connectors;

Pape discloses or at least renders obvious this limitation. *See* EX1005, 7:45-8:51, 9:32-10:5, Figs. 1-4; EX1003, ¶89. As discussed for element 1[p], Pape discloses semiconductor device 1 having a semiconductor chip 4 and a wiring substrate 27. *See* Section III.B.1.i (element 1[p]). The wiring substrate 27 (*a semiconductor die support*) has "contact pads 29" and "supply contact pads 32" (*having external connectors*).   EX1005, 7:45-8:26, Fig. 1; EX1003, ¶89. Annotated Figure 1 of Pape, reproduced below, shows this arrangement.



**EX1005, Fig. 1 (annotated)**

Pape explains that the contact pads 29 of wiring substrate 27 are "electrically connected" via "bonding wires 30" to "signal contact areas 5…arranged in the edge regions…of the top side 11 of the semiconductor chip 4."  EX1005, 7:45-8:26, Fig. 1. Moreover, the supply contact pads 32 of wiring substrate 27 are connected via "thick bonding wires 31" to "supply contact pads 33 in the edge regions…of the semiconductor chip 4." *Id.*

Pape's wiring substrate 27 forms the claimed *semiconductor die support* because it is the structural element upon which semiconductor chip 4 is mounted. EX1005, 7:45-8:51, Fig. 1; EX1003, ¶92. Indeed, with reference to Figure 1 above,

wiring substrate 27 serves as the support structure to which semiconductor chip 4 is attached. EX1005, 7:45-8:51; EX1003, ¶92. Moreover, as discussed above with respect to 1[p], Pape's Figure 3 depicts a cross-section of a semiconductor chip 4 within a housing 25 that would be the same or similar to a cross-section of semiconductor chip 4 in Figure 1, and shows that the semiconductor chip is mounted on top of wiring substrate 27—i.e., wiring substrate 27 serves as the support structure to which the semiconductor chip is attached.  EX1005, 7:45-8:51, 9:32-49, Figs. 1-3; *see* Section III.B.1.i (element 1[p]).



**EX1005, Fig. 1 (annotated)**

As such, the POSITA would have understood or at least found obvious that the wiring substrate 27 is a *semiconductor die support* within the meaning of the '189 Patent's claims because it is the component upon which semiconductor chip 4 is physically mounted, providing support. EX1003, ¶94 (citing EX1008, 29 & Fig. 1 to show that the concepts of die attaches mounted on a substrate were well known).

Contact pads 29 and supply contact pads 32 of wiring substrate 27 form the claimed *external connectors* at least because they are substrate-side connection points that are external to semiconductor chip 4. EX1005, 7:45-8:26, Fig. 1; EX1003, ¶95. Contact pads 29 are electrically connected to signal contact areas 5 of the semiconductor chip 4, and supply contact pads 32 are connected to supply contact pads 33 of the semiconductor chip 4. EX1005, 7:45-8:26, Fig. 1. Contact pads 29 and supply contact pads 32 are thus external to semiconductor chip 4 and provide the connection points for signals and supply potentials. *Id.* Moreover, the POSITA would have understood or at least found obvious that contact pads 29 and supply contact pads 32 are *external connectors* of Pape's semiconductor device package within the meaning of the '189 Patent's claims because they are disposed on wiring substrate 27 (i.e., *external* to semiconductor chip 4) and are such connection points for signals and supply potentials. *Id.*; EX1003, ¶95.

Additionally, or in the alternative, Pape's wiring substrate 27 (*semiconductor die support*) includes "supply exterior contacts 26" that also form *external connectors*. EX1005, 9:32-10:5, Fig. 3, Fig. 4; EX1003, ¶96. Supply exterior contacts 26 are *external connectors* as claimed because they are the connection points for connections external to the semiconductor device's housing (as well as external to the semiconductor chip 4). *Id.*; EX1003, at ¶96. Indeed, supply exterior contacts 26 are the physical points at which semiconductor device 1 connects to the

external environment (e.g., a printed circuit board). *See* EX1005, 9:32-49 (explaining that contact pads 29 and supply contact pads 32 are connected "via corresponding through contacts 34 to supply exterior contacts 26"), Fig. 3. Moreover, the POSITA would have understood or at least found obvious that supply exterior contacts 26 are *external connectors* of Pape's semiconductor device package within the meaning of the '189 Patent claims because they are the outwardly exposed connection points of the semiconductor device—i.e., the connectors through which semiconductor device 1 makes electrical connection external to the package itself. *Id.*; EX1003, ¶96 (citing EX1008, 30-31 & Fig. 1.37 (showing a PBGA substrate with solder balls and vias for ground/signal paths)).

Pape therefore discloses or at least renders obvious 1[a]. EX1003, ¶97.

> **iii.**    **1[b]: a semiconductor die mounted to the die support, the semiconductor die having a die support mounting surface attached to the die support and an opposite die connection pad surface with associated die connection pads, wherein the connection die pads are circuit nodes of the semiconductor die;**

Pape discloses or at least renders obvious this limitation. *See* EX1005, 1:43-2:4, 2:59-3:12, 7:45-8:51, 9:32-10:5, Figs. 1-4; EX1003, ¶98. As discussed in Section III.B.1.ii (element 1[a]), Pape's wiring substrate 27 forms the claimed *die support*. *See* Section III.B.1.ii (element 1[a]). Pape discloses that its "semiconductor chip 4" (*a semiconductor die*) is mounted to wiring substrate 27 (*mounted to the die support*), and that semiconductor chip 4 has an underside surface attached to wiring

substrate 27 (*the semiconductor die having a die support mounting surface attached to the die support*) and an "active top side 11" opposite to the underside surface (*and an opposite die connection pad surface*). EX1005, 7:45-8:51, 9:32-10:5, Figs. 1, 3; EX1003, ¶98. The active top side 11 (*opposite die connection pad surface*) includes "signal contact areas 5 and supply contact areas 6" (*with associated die connection pads*). *See* EX1005, 7:54-56 ("Signal contact areas 5 and supply contact areas 6 are arranged alternately in the edge regions 7, 8, 9 and 10 of the top side 11 of the semiconductor chip 4."), 2:59-3:12 (describing the "active top side" of the semiconductor chip on which "signal contact areas" and" supply contact areas" are arranged); *id.* at 7:45-8:51. Signal contact areas 5 and supply contact areas 6 are circuit nodes of semiconductor chip 4 (*wherein the connection die pads are circuit nodes of the semiconductor die*). *See* EX1005, 7:45-8:51; EX1003, ¶98.

Pape's semiconductor chip 4 (*a semiconductor die*) is mounted to wiring substrate 27 and has its underside surface attached to wiring substrate 27 (*mounted to the die support, the semiconductor die having a die support mounting surface attached to the die support*). EX1005, 7:45-8:51, 9:32-10:5, Figs. 1, 4; EX1003, ¶99.



**EX1005, Fig. 1 (annotated)**

Indeed, Pape explains that bonding wires (e.g., 30, 31) connect the active top side 11 of semiconductor chip 4 to the top side 28 of wiring substrate 27. EX1005, 7:45-8:51, Fig. 1. Moreover, as discussed above with respect to 1[p] and 1[a], Pape's Figure 3 cross-section depicts semiconductor chip 4 mounted on top of wiring substrate 27, and a POSITA would have understood or at least found obvious that this cross-section shows how the semiconductor chip 4 of Figure 1 would have been mounted to wiring substrate 27 as well (*a semiconductor die mounted to the die support*). *See* Sections III.B.1.i-ii (elements 1[p]-1[a]); EX1005, 7:45-8:51, 9:32-

10:5, Figs. 1, 3; EX1003, ¶100. Moreover, the POSITA would have understood or at least found obvious from Figure 3, and from Pape's express description of bonding wires connecting the top side of chip 4 to the top side of wiring substrate 27, that semiconductor chip 4 is mounted to wiring substrate 27 with its underside (bottom, non-active) surface attached to top side 28 of wiring substrate 27 (*the semiconductor die having a die support mounting surface attached to the die support*). *See* Sections III.B.1.i-ii (elements 1[p]-1[a]); EX1005, 7:45-8:51, 9:32-10:5, Figs. 1, 3; EX1003, ¶101 (citing EX1008, 29-31 & Fig. 1.37). Indeed, as shown by both Figures 1 and 3, the underside of semiconductor chip 4 is attached to the top side of wiring substrate 27. EX1005, 7:45-8:51, 9:32-10:5, Figs. 1, 3; EX1003, ¶101.



**EX1005, Fig. 3 (annotated)**

As noted, semiconductor chip 4 (*the semiconductor die*) has active top side 11 that includes signal contact areas 5 and supply contact areas 6 (*having…an opposite die connection pad surface with associated die connection pads*). EX1005, 7:45-

8:51, Fig. 1; EX1003, ¶102. The top side 11 is *an opposite die connection pad surface* because it is on the opposite side of semiconductor chip 4 relative to its underside surface that is attached to top side 28 of wiring substrate 27. EX1005, 7:45-8:51, 9:32-10:5, Figs. 1, 3; EX1003, ¶102. Moreover, top side 11 (*opposite die connection pad surface*) has *associated die connection pads* that are signal contact areas 5 and supply contact areas 6; Pape expressly describes that "[s]ignal contact areas 5 and supply contact areas 6 are arranged alternately in the edge regions 7, 8, 9 and 10 of the [active] top side 11 of semiconductor chip 4." EX1005, 7:45-8:51, Fig. 1; EX1003, ¶102.

The signal contact areas 5 and supply contact areas 6 (*the connection die pads*) are circuit nodes of semiconductor chip 4 (*are circuit nodes of the semiconductor die*). EX1005, 7:45-8:51, 9:32-10:5, Figs. 1, 3; EX1003, ¶103. The '189 Patent states that "the connection die pads are circuit nodes of the semiconductor die." EX1001, 2:55-56; EX1003, ¶103. Accordingly, Pape explains that signal contact areas 5 and supply contact areas 6 are both circuit nodes of the integrated circuitry of semiconductor chip 4 since they are die pad connections. EX1003, ¶103. Regarding signal contact areas 5, Pape explains that the bonding wires 30 connected between the signal contact areas 5 and contact pads 29 provide that "electrical signals can be passed from and to the semiconductor chip 4," confirming that signal contact areas 5 are on-chip circuit nodes of semiconductor chip 4 (*are circuit nodes of the*

*semiconductor die*) at which signals enter and exit the integrated circuitry of semiconductor chip 4. EX1005, 7:45-8:26, Fig. 1; EX1003, ¶103. With respect to supply contact areas 6, Pape describes that such areas are on-chip points through which current is "fed" into the chip's circuitry. EX1005, 1:60-2:4. Pape further describes that supply currents "are intended to be distributed on the semiconductor chip to the [s]witching function through metal cross-sections having the lowest possible resistance, in order to avoid local voltage dips." *Id.* at 1:43-56. These passages confirm that supply contact areas 6 are not merely passive landing points but are the on-chip circuit nodes of semiconductor chip 4 (*are circuit nodes of the semiconductor die*) through which supply currents are introduced into, and routed within, the integrated circuitry of semiconductor chip 4. *Id.* at 1:43-2:4, 7:45-8:51, Fig. 1; EX1003, ¶104. The POSITA would have understood that signal contact areas 5 and support contact areas 6 are circuit nodes that respectively provide a path for signal and power to reach the integrated circuits on the chip. *See* EX1008, at 1 (recognizing that the major functions of electronic package include "(1) to provide a path for the electrical current that powers the circuits on the chip" and "(2) to distribute the signals on to and off of the silicon chip"). The POSITA would accordingly have understood or at least found obvious that signal contact areas 5 and supply contact areas 6 are *circuit nodes of the semiconductor die* within the meaning of the '189 Patent claims because they are the components of semiconductor chip 4

that are electrically connected to, and serve as the electrical nodes for, the chip's internal signal-processing and supply circuitry. EX1003, ¶104.

Pape therefore discloses or at least renders obvious element 1[b]. EX1003, ¶105.

> #### iv.      1[c]: at least one power rail pad on the die connection pad surface, the power rail pad having a larger surface area than surface areas of the die connection pads; and

Pape discloses or at least renders obvious this limitation. See Section III.B.1.iii; EX1005, 2:66-3:65, 3:40-44, 3:55-57, 4:11-31, 4:50-65, 6:1-15, 6:39-58, 7:45-8:51, 9:1-16, 9:32-10:5, Fig. 1; EX1003, ¶106. As discussed in Section III.B.1.iii (element 1[b]), the active top side 11 of semiconductor chip 4 is *the die connection pad surface*. Section III.B.1.iii (element 1[b]). Pape discloses "annular supply collective electrode 14" and "annular supply collective electrode 15" (two instances of the claimed *at least one power rail pad*) that are arranged on the active top side 11 of semiconductor chip 4 (*on the die connection pad surface*). EX1005, 2:66-3:65, 7:45-8:51, Fig. 1; EX1003, ¶106. And as shown by Figure 1, annular supply collective electrode 14 and annular supply collective electrode 15 each obviously have a larger surface area than the individual surface areas of signal contact areas 5 and supply contact areas 6 of semiconductor chip 4 (*the power rail pad having a larger surface area than surface areas of the die connection pads*). EX1005, 2:66-3:65, 4:11-25, 7:45-8:51, Fig. 1; EX1003, ¶107.



**EX1005, Fig. 1 (annotated)**

Specifically, Pape's annular supply collective electrode 14 and annular supply collective electrode 15 form the claimed *at least one power rail pad* and are arranged on the active top side 11 of semiconductor chip 4 (*on the die connection pad surface*). EX1005, 2:66-3:65, 7:45-8:51, Fig. 1; EX1003, ¶108. As shown in Pape's Figure 1 and described by Pape, annular supply collective electrodes 14 and 15 sit on top of active top side 11 of semiconductor chip 4, and are positioned within the perimeter of signal contact areas 5 and supply contact areas 6 —i.e., on the same surface of semiconductor chip 4 that bears these contact areas. EX1005, 2:66-3:65,

7:45-8:51, Fig. 1; EX1003, ¶108. Pape further discloses that, in Figure 1, one of the electrodes 14 and 15 is provided for the supply (positive voltage) potential and the other of electrodes 14 and 15 is provided for the ground potential. EX1005, 2:66-3:65, 4:11-17 ("[A]t least one of the supply collective electrodes is provided for a ground potential and another supply collective electrode has a supply potential. Consequently, these annular supply collective electrodes can supply all of the supply contact areas, whether for application of a ground potential or for application of a power potential."), 7:45-8:16, Fig. 1 8:17-22 ("These more solid supply contact pads 33 are connected to annular supply collective electrodes 14 or 15, to which a ground potential and a supply potential can be applied via the bonding wires 31 and the supply contact pads 33."), 8:23-51. Annotated Figure 1 below illustrates an embodiment where outer annular supply collective electrode 14 is provided for the positive supply voltage and inner annular supply collective electrode 15 is provided for ground. *Id.*



**EX1005, Fig. 1 (annotated)**

Pape further confirms that annular supply collective electrodes 14 and 15 are arranged on active top side 11 of semiconductor chip 4 in a manner consistent with how the '189 Patent describes the placement of the claimed *at least one power rail pad on the die connection pad surface* and how the applicants interpreted this limitation during prosecution. EX1001, 4:13-16, 4:29-31; EX1002, 74; EX1005, 2:66-3:65, 4:11-17, 7:45-8:51, Fig. 1; EX1003, ¶110. Indeed, during prosecution, the applicants asserted that this limitation required that to be *on the die connection pad surface*, the claimed *at least one power rail pad* is "not [an] integrated node[] of the circuitry within the semiconductor die" and is instead "mounted on the die

surface and attached thereto with an adhesive" in view of the '189 Patent's disclosure at 4:13-16 and 4:29-31 (paragraphs 0027 and 0029 of the underlying applicant's specification). *See* Section I.C.4 (Prosecution History). This is exactly what Pape discloses. Pape discloses that annular supply collective electrode 14 and annular supply collective electrode 15 (*at least one power rail pad*) are each mounted on active top side 11 of semiconductor chip 4, where each of the annular supply collective electrodes 14 and 15 are separately fabricated "metal rings made of a metal foil or a metal foil on a carrier that are **adhesively bonded or soldered** on in the inner region of the top side of the semiconductor chip" (*on the die connection pad surface*). EX1005, 7:45-8:51, 6:1-15 (emphasis added), Fig. 1; *see id.* at 2:66-3:35, 4:50-65, 6:39-58, 7:45-8:51, 9:1-16. Moreover, annular supply collective electrode 14 and annular supply collective electrode 15 are "soldered or adhesively bonded directly onto a semiconductor wafer **after** the individual integrated circuit elements have been produced on the semiconductor wafer" rather than integrated within the die's circuitry. *Id.* at 6:39-58 (emphasis added). As such, in view of the above, a POSITA would have understood or at least found obvious that Pape's disclosure of arranging annular supply collective electrode 14 and annular supply collective electrode 15 to the active top side 11 of semiconductor chip 4 exactly corresponds to how the *at least one power rail pad* is arranged *on the die connection pad surface* within the meaning of the '189 Patent's claims. EX1005, 2:66-3:65, 6:1-15, 6:39-

58, 7:45-8:51, Fig. 1; EX1003, ¶112 (citing EX1007, 397-398 & Fig. 10-4 (illustrating a conventional plastic package in which wires are bonded to chip bonding pads and leadframe fingers)).

Finally, Pape's annular supply collective electrodes 14 and 15 each have a larger surface area than surface areas of signal contact areas 5 and supply contact areas 6 of semiconductor chip 4 (*the power rail pad having a larger surface area than surface areas of the die connection pads*). EX1005, 2:66-3:65, 4:11-25, 7:45-8:51, Fig. 1; EX1003, ¶113. As shown in Pape's Figure 1 (annotated below), each of annular supply collective electrodes 14 and 15 occupies a substantial portion of active top side 11 of semiconductor chip 4—extending around the central portion of active top side 11 as a continuous ring—while each individual signal contact area 5 and supply contact area 6 is a small discrete pad arranged in the edge regions of active top side 11. EX1005, Fig. 1; EX1003, ¶113.



**EX1005, Fig. 1 (annotated)**

The size disparity is visually unmistakable from Figure 1, and is reinforced by Pape's express teaching that "such an annular electrode can be embodied significantly more solidly and with lower resistance than a metal layer or a rewiring on the semiconductor chip." EX1005, 3:40-44, Fig. 1. Indeed, this size and structural robustness is essential to Pape's stated function for electrodes 14 and 15: each electrode "function[s] as [a] potential busbar[] or current distributor[]" on active top side 11, thus aggregating supply current from many supply contact areas 6 and routing it to a small number of external bonding wires. EX1005, 3:55-57, 7:45-8:51, 9:32-10:5, Fig. 1; EX1003, ¶114. Furthermore, a POSITA would have understood

or at least found obvious that annular supply collective electrodes 14 and 15 each have a surface area substantially larger than the surface area of any single signal contact area 5 or supply contact area 6—both because Figure 1 depicts that size disparity directly and because Pape's express description of electrodes 14 and 15 as solid current-distributing busbars connected to many individual supply contact areas necessarily teaches a much larger surface area than any single supply contact area. EX1005, 3:55-57, 7:45-8:51, 9:32-10:5, Fig. 1; EX1003, ¶115. Pape's disclosure aligns with the '189 Patent, which explains that the surface area of each power rail pad is larger than the "average surface area of the die connection pads." EX1001, 3:60-4:9; EX1003, ¶115.

Pape's annular supply collective electrodes 14 and 15 further form the claimed *power rail pad* to the extent the term is construed as "a conductive pad, not integrated with the die circuitry, that supplies power to circuit nodes of the die." *See* Section III.A. This is because, as discussed above and in Sections III.B.1.v (element 1[d]), III.B.3 (Claim 3), and III.B.5 (Claim 5), *infra*, annular supply collective electrodes 14 and 15 are surface soldered or adhesively bonded conductive pads that provide a ground potential or a supply potential to supply contact areas 6 of semiconductor die 4.

Pape therefore discloses or at least renders obvious element 1[c]. EX1003, ¶117.

> **v.**    **1[d]: die wire bonds electrically coupling the power rail pad to at least two of the die connection pads.**

Pape discloses or at least renders obvious this limitation. EX1005, 2:66-3:65, 4:11-65, 6:1-29, 7:8-14, 7:45-8:51, Fig. 1; EX1003, ¶118. As discussed in Section III.B.1.iii (element 1[b]) and Section III.B.1.iv (element 1[c]), Pape's annular supply collective electrode 14 and annular supply collective electrode 15 each individually form *the power rail pad* as claimed and Pape's signal contact areas 5 and supply contact areas 6 form *the die connection pads* as claimed. *See* Sections III.B.1.iii (element 1[b]), III.B.1.iv (element 1[c]). Pape further discloses "internal connecting elements 16 made of the shortened bonding wires 20" (*die wire bonds*) that electrically couple each of annular supply collective electrode 14 and annular supply collective electrode 15 (*electrically coupling the power rail pad*) to multiple supply contact areas 6 (*to at least two of the die connection pads*) on the active top side 11 of semiconductor chip 4. EX1005, 2:66-3:65, 4:11-65, 6:1-29, 7:8-14, 7:45-8:51, Fig. 1; EX1003, ¶118.



**EX1005, Fig. 1 (annotated)**

Pape's Figure 1 (annotated above) shows that shortened bonding wires 20 (*die wire bonds*) extend from supply contact areas 6 along the periphery of the active top side 11 of semiconductor chip 4 inward to annular supply collective electrode 14 and annular supply collective electrode 15, with the bonding wires 20 (*die wire bonds*) coupling each of the electrodes 14 and 15 to multiple supply contact areas 6 (*electrically coupling the power rail pad to at least two of the die connection pads*). EX1005, 2:66-3:65, 4:11-65, 6:1-29, 7:8-14, 7:45-8:51, Fig. 1; EX1003, ¶119. Pape expressly teaches that this arrangement couples "most" of the supply contact areas 6 of semiconductor chip 4 to annular supply collective electrodes 14 and 15—far more than the *at least two* required by claim 1. EX1005, 6:1-10.

Moreover, Figure 1 shows above, each of annular supply collective electrodes 14 and 15 have at least two (and more) bonding wires coupling to at least two (and more) supply contact areas 6. EX1005, Fig. 1.

Pape's bonding wires 20 perform the same function as the claimed *die wire bonds* because they aggregate semiconductor chip 4's many on-die supply connections into the larger annular supply collective electrodes 14 and 15, so that a smaller number of external supply wires are required to leave the package. EX1005, 2:66-3:65, 4:11-65, 6:1-29, 7:8-14, 7:45-8:51, Fig. 1; EX1003, ¶120 (explaining that package "conductors supply power and provide ground or other reference voltages," citing EX1006, 22-23). This is just like the '189 patent, which explains "[a]dvantageously, the present invention provides for the reduction of power rail wire bonds 502 by the use of the first and second power rail pads 309, 310" and "[m]ore specifically, the wire bond connections from the die connection pads to the power rail pads 309, 310 reduce the number of connections to the substrate or lead-frame and therefore potentially shorten the data wire bond connection lengths therebetween," which provides that "the footprint, number of external connectors, potential stray capacitances and the possibility of noise induction can be reduced or at least alleviated." EX1001, 7:4-13. Indeed, Pape's teachings address the same alleged benefits proposed by the '189 Patent because, by using shortened bonding wires 20 to carry supply potentials from supply contact areas 6 to annular supply

collective electrodes 14 and 15, "[o]nly a few bonding or soldering connections which extend beyond the [semiconductor chip 4] to the flat frame or the wiring substrate are required for application of the associated supply potential." EX1005, 3:52-55; *see also id.* at 3:55-57 (describing the "annular supply collective electrodes" (i.e., electrodes 14 and 15) as "function[ing] as potential busbars or current distributors"). The POSITA would have thus understood that Pape's bonding wires 20 form the claimed *die wire bonds* within the meaning of the '189 Patent claims because they are bonding wires on active top side 11 of semiconductor chip 4 that electrically couple a *power rail pad* (each of annular supply collective electrode 14 and annular supply collective electrode 15) to multiple *die connection pads* (supply contact areas 6)—exactly as the '189 Patent describes. EX1005, 2:66-3:65, 4:11-65, 6:1-29, 7:8-14, 7:45-8:51, Fig. 1; EX1003, ¶121.

Pape therefore discloses or at least renders obvious element 1[d]. EX1003, ¶122.

### 2.    Claim 2

Pape discloses or at least renders obvious Claim 2. EX1003, ¶123.

> i.    **[2a]: The semiconductor die package of claim 1, wherein the at least one power rail pad includes a first power rail pad and a second power rail pad each**

**individually coupled by the die wire bonds to at least two of the die connection pads.**

Pape discloses or at least renders obvious this limitation. *See* Sections III.B.1.iv (element 1[c]), III.B.1.v (element 1[d]); EX1005, 2:66-3:65, 4:11-65, 6:1-29, 7:8-14, 7:45-8:51, Fig. 1; EX1003, ¶124. As discussed in Section III.B.1.iv (element 1[c]), Pape's annular supply collective electrode 14 and annular supply collective electrode 15 form *the at least one power rail pad* (*see* Section III.B.1.iv (element 1[c])), and thus, annular supply collective electrode 14 forms *a first power rail pad* and annular supply collective electrode 15 forms *a second power rail pad*. *see* Section III.B.1.iv (element 1[c]); *see also* EX1005, 8:27-43 (describing annular supply collective electrode 14 as an "outer supply collective electrode 14 [that] forms an open ring with a passage opening 23" and annular supply collective electrode 15 as an "inner annular supply collective electrode 15 [that] has a closed ring.").



**EX1005, Fig. 1 (annotated)**

As discussed in Section III.B.1.v (element 1[d]), Pape's bonding wires 20 (*die wire bonds*) electrically couple each of annular supply collective electrode 14 and annular supply collective electrode 15 to multiple supply contact areas 6 (*to at least two of the die connection pads*). Section III.B.1.v (element 1[d]). As such, Pape's annular supply collective electrode 14 (*first power rail pad*) is electrically coupled by bonding wires 20 to multiple supply contact areas 6 (*individually coupled by the die wire bonds to at least two of the die connection pads*), and annular supply collective electrode 15 (*second power rail pad*) is also electrically coupled by

bonding wires 20 to multiple supply contact areas 6 (*individually coupled by the die wire bonds to at least two of the die connection pads*). *Id.*

Indeed, as shown by Figure 1, Pape's bonding wires 20 electrically couple each of annular supply collective electrodes 14 and 15 to "most" of the supply contact areas 6 on the active top side 11 of semiconductor chip 4—far more than the *at least two* required by claim 2—with each annular supply collective electrode individually coupled by its own set of shortened bonding wires 20 to its own corresponding group of supply contact areas 6. *Id*; EX1005, 2:66-3:65, 4:11-65, 6:1-29, 7:8-14, 7:45-8:51, Fig. 1; EX1003, ¶126.



**EX1005, Fig. 1 (annotated)**

Pape therefore discloses or at least renders obvious claim 2. EX1003, ¶127.

### 3. Claim 3

Pape discloses or at least renders obvious Claim 3. EX1003, ¶128.

> i. **[3a]: The semiconductor die package of claim 2, wherein the die connection pads include positive voltage supply rail die connection pads, and wherein the die wire bonds electrically couple the first power rail pad to at least two of the positive voltage supply rail die connection pads.**

Pape discloses or at least renders obvious this limitation. *See* EX1005, 1:60-2:4, 2:66-3:65, 4:11-25, 5:44-58, 6:1-51, 7:15-23, 7:45-8:51, 9:67-10:5, Fig. 1; EX1003, ¶129. As discussed in Section III.B.1.iii (element 1[b]), Pape's signal contact areas 5 and supply contact areas 6 form *the die connection pads*. Section III.B.1.iii (element 1[b]). Pape discloses that the signal contact areas 5 and supply contact areas 6 (*the die connection pads*) include certain of the supply contact areas 6 that are connected to the positive voltage potential of the annular supply collective electrode 14 (*include positive voltage supply rail die connection pads*). EX1005, 2:66-3:65 ("…all of the supply contact areas can be connected to a ground potential or to an operating potential by the annular supply collective electrodes arranged on the top side of the semiconductor chip…"), 4:11-25 ("…at least one of the supply collective electrodes is provided for a ground potential and another supply collective electrode has a supply potential. Consequently, these annular supply collective electrodes can supply all of the supply contact areas, whether for application of a ground potential or for application of a power potential."), 5:44-58, 6:1-51, 7:15-23

("For the operation of the semiconductor chip, a ground potential and supply potentials are applied to a small number of exterior connections of the semiconductor device for the supply collective electrodes"), 7:45-8:51, 9:67-10:5; *see* Sections III.B.1.iv (element 1[c])- III.B.1.v (element 1[d]); EX1003, ¶129.

As discussed in Section III.B.1.v (element 1[d]), Pape's bonding wires 20 form *the die wire bonds* as claimed. Section III.B.1.v (element 1[d]). As discussed in Section III.B.2 (Claim 2), Pape's annular supply collective electrode 14 forms *the first power rail pad*. Section III.B.2 (Claim 2). Pape's bonding wires 20 (*and wherein the die wire bonds*) electrically connect the annular supply collective electrode 14 (*electrically couple the first power rail pad*) to multiple of the certain supply contact areas 6 that have a positive voltage potential (*to at least two of the positive voltage supply rail die connection pads*), as discussed above. *See supra*, Section III.B.2; EX1005, 2:66-3:65, 4:11-25, 5:44-58, 6:1-51, 7:15-23, 7:45-8:51, 9:67-10:5; *see* Sections III.B.1.iv (element 1[c])- III.B.1.v (element 1[d]); EX1003, ¶130.

Indeed, Pape's shortened bonding wires 20 (the claimed *die wire bonds*) electrically couple outer annular supply collective electrode 14 to "most" of the supply contact areas 6 of semiconductor chip 4 that carry that supply potential—far more than the *at least two* required by claim 3. EX1005, 2:66-3:65, 4:11-25, 5:44-58, 6:1-51, 7:15-23, 7:45-8:51, 9:67-10:5; EX1003, ¶131.



**EX1005, Fig. 1 (annotated)**

Moreover, Pape's "supply potential" (as distinguished from "ground potential") would be understood by the POSITA to refer to a positive voltage supply potential. EX1003, 132 (explaining these concepts were well known, citing EX1006, 22-23 ("two distinct sets of terminals . . . signals and power" and "the 'ground' designates a neutral reference voltage"); EX1008, 13-14 ("the IC power supply (operating voltage) is reducing from 5 V to either 3 or 3.3 V now, and eventually to 2.5, then 1.5 V.")). Pape itself draws an express dichotomy between "ground potential" on the one hand and "supply potential" on the other: "at least one of the supply collective electrodes is provided for a ground potential and another supply collective electrode has a supply potential." EX1005, 4:11-14. Pape similarly

distinguishes "the ground connection" from "the power connection" when describing the supply contact areas to which the annular electrodes are connected. *Id.* at 3:48-52 ("most of the supply contact areas both for the ground connection and for the power connection are connected by bonding or soldering contact connections in the direction of the annular supply collective electrodes"). The POSITA would have understood this dichotomy to refer to the two rails of a standard chip power-supply scheme—a positive voltage supply rail and a ground rail—because that is the standard way semiconductor chips of the type described in Pape are powered. EX1003, ¶132 (citing EX1006, 23 ("Other conductors supply power and provide ground or other reference voltages."); EX1008, 13-15 (describing IC supply voltages ranging from 5V to 1.5V)).

Pape's Background reinforces this understanding. Pape describes a "current of 1 A" being "fed . . . into the circuit" through 100 supply contact areas, with "just as many ground contact areas . . . required in order to enable the current to flow away again." EX1005, 1:60-2:4. This passage describes a conventional positive-supply-and-ground arrangement: current is "fed in" at the supply contact areas (connected to the positive supply rail) and "flow[s] away" through the ground contact areas (connected to the ground rail). *Id.*; EX1003, ¶133.

Pape therefore discloses or at least renders obvious claim 3. EX1003, ¶134.

### 4. Claim 4

Pape discloses or at least renders obvious Claim 4. EX1003, ¶135.

> i. **[4a]: The semiconductor die package of claim 3, wherein power rail wire bonds directly electrically couple the first power rail pad to at least one of the external connectors.**

Pape discloses or at least renders obvious this limitation. See EX1005, 2:66-3:65, 3:40-44, 3:55-57, 4:11-31, 4:50-65, 6:1-15, 6:39-58, 7:45-8:51, 9:1-16, 9:32-10:5, Fig. 1; EX1003, 136. As discussed in Section III.B.2 (Claim 2), Pape's annular supply collective electrode 14 forms *the first power rail pad*. Section III.B.2 (Claim 2). As discussed in Section III.B.1.ii (element 1[a]), Pape's contact pads 29 and supply contact pads 32 form *the external connectors*. Section III.B.1.ii (element 1[a]). Pape further discloses "bonding wires 31" (*power rail wire bonds*) that directly electrically connect annular supply collective electrode 14 (*directly electrically couple the first power rail pad*) to a supply contact pads 32 (*to at least one of the external connectors*), as shown by Figure 1 below. EX1005, 7:45-8:51, 9:63-10:5, Fig. 1; EX1003, ¶136.



**EX1005, Fig. 1 (annotated)**

Pape discloses that bonding wires 31 are "thick" wires that "form connecting elements 12 between corresponding supply contact pads 32 of the wiring substrate 27 and supply contact pads 33 in edge regions." EX1005, 7:45-8:51, Fig. 1. Pape expressly describes these bonding wires 31 as "made of aluminum and hav[ing] a diameter from 50 µm and 600 µm," which is substantially thicker than the thin gold "bonding wires 30" used to convey signals and thus reflect their function as the high-current power-rail conductors of semiconductor device 1. *Id.*; EX1003, ¶137. As

such, bonding wires 31 form *power rail wire bonds* as claimed. *Id.* Moreover, it would have been well-understood to the POSITA that the "thick wires" disclosed by Pape could obviously be implemented using multiple smaller wires—this was a common and well-known technique.

And Pape's bonding wires 31 electrically connect the supply contact pads 33 of annular supply collective electrode 14 to supply contact pads 32, where such contact pads 33 can be either an integrated part of annular supply collective electrode 14 or connected to annular supply collective electrode 14. EX1005, 7:45-8:51, Fig. 1. While Figure 1 shows one instance of supply contact pad 33 being integrated with annular supply collective electrode 14 (top portion of Figure 1 above) and another instance of supply contact pad 33 being connected to annular supply collective electrode 14 (bottom-right portion of Figure 1 above), a POSITA would have understood or at least found obvious that an obvious variant to the arrangement of Figure 1 would have been to have both of supply contact pads 33 integrated with annular supply collective electrode 14. *Id.*; EX1003, 138. This would have been nothing more than a routine modification to the Figure 1 arrangement that would have had a reasonable expectation of success due to its straightforward nature—i.e, simply requiring pads 33 to both be integrated parts of the metal foil that forms annular supply collective electrode 14. EX1005, 2:66-3:65, 3:40-44, 3:55-57, 4:11-31, 4:50-65, 6:1-15, 6:39-58, 7:45-8:51, 9:1-16, 9:32-10:5, Fig. 1; EX1003, 138.

And in such a case, multiple bonding wires 31 would have directly electrically coupled the integrated pads 33 of annular supply collective electrode 14 to supply contact pads 32 (*wherein power rail wire bonds directly electrically couple the first power rail pad to at least one of the external connectors*). *Id.*

Indeed, the POSITA would have understood that bonding wire 31 "directly electrically couples" outer annular supply collective electrode 14 to supply contact pads 32 of wiring substrate 27 within the meaning of the '189 Patent claims because there would have been no intervening die circuitry along the path—the path runs from outer annular supply collective electrode 14, through the integral supply contact pads 33, through bonding wires 31, to supply contact pads 32 of wiring substrate 27. EX1005, 7:45-8:51, Fig. 1; EX1003, ¶139. This is consistent with how the '189 Patent describes *directly electrically couple* in the context of its own claimed power rail wire bonds, which the specification depicts as wire bonds that run from the power rail pad to the external connector with no intervening circuit elements. See EX1001 at 4:47-57, 6:1-11, Figs. 5, 9; EX1003, ¶139.

Pape therefore discloses or at least renders obvious claim 4. EX1003, ¶140.

### 5.    Claim 5

Pape discloses or at least renders obvious Claim 5. EX1003, ¶141.

> i.    **[5a]: The semiconductor die package of claim 4, wherein the die connection pads include ground supply rail die connection pads and wherein the die wire bonds electrically couple the second power rail**

**pad to at least two of the ground supply rail die connection pads.**

Pape discloses or at least renders obvious this limitation. EX1005, 2:66-3:65, 4:11-25, 5:44-58, 6:1-51, 7:15-23, 7:45-8:51, 9:67-10:5, Fig. 1; EX1003, ¶142. As discussed in Section III.B.1.iii (element 1[b]), Pape's signal contact areas 5 and supply contact areas 6 form *the die connection pads*. Section III.B.1.iii (element 1[b]). Pape discloses that the signal contact areas 5 and supply contact areas 6 (*the die connection pads*) include certain of the supply contact areas 6 that are connected to the ground potential of the annular supply collective electrode 14 (*include ground supply rail die connection pads*). EX1005, 2:66-3:65 ("…all of the supply contact areas can be connected to a ground potential or to an operating potential by the annular supply collective electrodes arranged on the top side of the semiconductor chip…"), 4:11-25 ("…at least one of the supply collective electrodes is provided for a ground potential and another supply collective electrode has a supply potential. Consequently, these annular supply collective electrodes can supply all of the supply contact areas, whether for application of a ground potential or for application of a power potential."), 5:44-58, 6:1-51, 7:15-23 ("For the operation of the semiconductor chip, a ground potential and supply potentials are applied to a small number of exterior connections of the semiconductor device for the supply collective electrodes"), 7:45-8:51, 9:67-10:5; *see* Sections III.B.1.iv (element 1[c])- III.B.1.v (element 1[d]); EX1003, ¶142.

As discussed in Section III.B.1.v (element 1[d]), Pape's bonding wires 20 form *the die wire bonds* as claimed. Section III.B.1.v (element 1[d]). As discussed in Section III.B.2 (Claim 2), Pape's annular supply collective electrode 15 forms *the second power rail pad*. Section III.B.2 (Claim 2). Pape's bonding wires 20 (*and wherein the die wire bonds*) electrically connect the annular supply collective electrode 15 (*electrically couple the second power rail pad*) to multiple of the certain supply contact areas 6 that have a ground potential (*to at least two of the ground supply rail die connection pads*), as discussed above. *See supra*, Section III.B.3; EX1005, 2:66-3:65, 4:11-25, 5:44-58, 6:1-51, 7:15-23, 7:45-8:51, 9:67-10:5; *see* Sections III.B.1.iv (element 1[c])-III.B.1.v (element 1[d]); EX1003, ¶143.

Indeed, Pape's shortened bonding wires 20 (the claimed *die wire bonds*) electrically couple outer annular supply collective electrode 15 to "most" of the supply contact areas 6 of semiconductor chip 4 that carry the ground potential—far more than the *at least two* required by claim 3. EX1005, 6:1-10, 8:21-27 ("The annular supply collective electrodes 14, 15 on the top side 11 of the semiconductor chip 4 are electrically connected by relatively short bonding wire connections 20 which are arranged in part in edge regions 7, 8, 9 and 10 of the top side 11 of the semiconductor chip 4 in this embodiment of the invention."); *id.* at 2:66-3:65, 4:11-25, 5:44-58, 6:1-51, 7:15-23, 7:45-8:51, 9:67-10:5; EX1003, ¶X144.



**EX1005, Fig. 1 (annotated)**

Pape therefore discloses or at least renders obvious claim 5. EX1003, ¶X145.

### 6.    Claim 6

Pape discloses or at least renders obvious Claim 6. EX1003, ¶146.

> **i.    [6a]: The semiconductor die package of claim 5, wherein power rail wire bonds electrically couple the second power rail pad to at least one of the external connectors.**

Pape discloses or at least renders obvious this limitation. EX1005, 2:66-3:65, 3:40-44, 3:55-57, 4:11-31, 4:50-65, 6:1-15, 6:39-58, 7:45-8:51, 9:1-16, 9:32-10:5, Fig. 1; EX1003, 147. As discussed in Section III.B.2 (Claim 2), Pape's annular supply collective electrode 15 forms *the second power rail pad*. Section III.B.2 (Claim 2). As discussed in Section III.B.1.ii (element 1[a]), Pape's contact pads 29

and supply contact pads 32 form *the external connectors*. Section III.B.1.ii (element 1[a]). As discussed in Section III.B.4 (Claim 4), Pape further discloses bonding wires 31 form *power rail wire bonds*. Section III.B.4 (Claim 4). Pape further discloses bonding wires 31 (*power rail wire bonds*) that electrically connect annular supply collective electrode 15 (*electrically couple the second power rail pad*) to a supply contact pads 32 (*to at least one of the external connectors*), as shown by Figure 1 below. EX1005, 7:45-8:51, 9:63-10:5, Fig. 1; EX1003, ¶147.



**EX1005, Fig. 1 (annotated)**

Pape discloses that bonding wires 31 are "thick" wires that "form connecting elements 12 between corresponding supply contact pads 32 of the wiring substrate

27 and supply contact pads 33 in edge regions." EX1005, 7:45-8:51, Fig. 1. Pape expressly describes these bonding wires 31 as "made of aluminum and hav[ing] a diameter from 50 μm and 600 μm," which is substantially thicker than the thin gold "bonding wires 30" used to convey signals and thus reflect their function as the high-current power-rail conductors of semiconductor device 1. *Id.*; EX1003, ¶148. As such, bonding wires 31 form *power rail wire bonds* as claimed. *Id.*

And Pape's bonding wires 31 electrically connect the supply contact pads 33 of annular supply collective electrode 15 to supply contact pads 32, where such contact pads 33 can be either an integrated part of annular supply collective electrode 15 or connected to annular supply collective electrode 15. EX1005, 7:45-8:51, Fig. 1. Figure 1 above shows one instance of supply contact pad 33 being integrated with annular supply collective electrode 15 (bottom portion of Figure 1 above) and another instance of supply contact pad 33 being connected to annular supply collective electrode 15 (top-right portion of Figure 1 above). In either case, the bonding wires 31 electrically couple the annular supply collective electrode 15 to supply contact pads 32 via pads 33 (*wherein power rail wire bonds electrically couple the second power rail pad to at least one of the external connectors*). EX1005, 2:66-3:65, 3:40-44, 3:55-57, 4:11-31, 4:50-65, 6:1-15, 6:39-58, 7:45-8:51, 9:1-16, 9:32-10:5, Fig. 1; EX1003, 149.

Pape therefore discloses or at least renders obvious claim 6. EX1003, ¶150.

### 7. Claim 7

Pape discloses or at least renders obvious Claim 7. EX1003, ¶151.

> **i.** **[7a]: The semiconductor die package of claim 4, wherein the die connection pads include ground supply rail die connection pads and wherein the die wire bonds electrically couple the second power rail pad to at least two of the ground supply rail die connection pads, and**

*See* Section III.B.5 (Claim 5).

> **ii.** **[7b]: wherein the power rail wire bonds electrically couple the second power rail pad to at least one of the external connectors.**

*See* Section III.B.6 (Claim 6).

### 8. Claim 8

Pape discloses or at least renders obvious Claim 8. EX1003, ¶154.

> **i.** **[8a]: The semiconductor die package of claim 7, wherein the die connection pads are adjacent respective edges of the semiconductor die and include data input and output pads for the semiconductor die, the data input and output pads being electrically connected by data wire bonds to the external connectors.**

Pape discloses or at least renders obvious this limitation. EX1005, 7:45-8:51, Fig. 1; EX1003, ¶155. As discussed for Section III.B.1.iii (element 1[b]), Pape's signal contact areas 5 and supply contact areas 6 form *the die connection pads*, and Pape's semiconductor chip 4 forms *the semiconductor die*. Section III.B.1.iii (element 1[b]). As discussed for Section III.B.1.ii (element 1[a]), Pape's contact

pads 29 and supply contact pads 32 form *the external connectors*. Section III.B.1.ii (element 1[a]).

Pape discloses that signal contact areas 5 and supply contact areas 6 (*wherein the die connection pads*) are arranged adjacent to the edges of semiconductor chip 4 (*are adjacent respective edges of the semiconductor die*) as shown in Figure 1 below. EX1005, 7:45-8:51, Fig. 1. Pape's signal contact areas 5 and supply contact areas 6 are "arranged alternatively in the edge regions 7, 8, 9 and 10 of the [active] top side 11 of the semiconductor chip 4"—i.e., along all four edges of semiconductor chip 4 as shown in Figure 1. *Id*.



**EX1005, Fig. 1 (annotated)**

As such, signal contact areas 5 and supply contact areas 6 are adjacent to the edges of semiconductor chip 4 (*wherein the die connection pads are adjacent respective edges of the semiconductor die*). *Id.*; EX1003, ¶157.

The signal contact areas 5 and supply contact areas 6 (*the die connection pads*) include signal contact areas 5 that are dedicated to the input and output of data signals to and from the integrated circuitry of semiconductor chip 4 (*include data input and output pads for the semiconductor die*). EX1005, 7:45-8:51; EX1003, ¶158. Pape's express terminology itself draws a dichotomy between "signal contact areas 5" on the one hand and "supply contact areas 6" on the other, segregating semiconductor chip 4's contact areas into two categories: signal contact areas (which carry signals) and supply contact areas (which carry supply and ground potentials). EX1005, 7:45-8:51. Pape further explains that "only electrical signals can be passed from and to the semiconductor chip 4 via said bonding wires 30" connected to signal contact areas 5. *Id.* at 8:1-4. The phrase "from and to the semiconductor chip 4" confirms that signal contact areas 5 are the on-chip nodes at which signals both enter and exit the integrated circuitry of semiconductor chip 4—i.e., they are the input and output pads for semiconductor chip 4 (*data input and output pads for the semiconductor die*). *Id.*; EX1003, ¶158.

Moreover, the POSITA would have understood or at least found obvious that Pape's "signals" carried by signal contact areas 5—as distinguished from the

"supply" and "ground" potentials carried by supply contact areas 6—refer to data signals input to or output from the integrated circuitry of semiconductor chip 4. EX1003, ¶159. This is consistent with the standard terminology and architecture of semiconductor chips of the type described in Pape, in which the chip's contact areas are conventionally divided into power/ground connections used to deliver supply potentials and input/output (I/O) connections used to convey data signals to and from the chip's circuitry. EX1003, ¶159 (citing EX1008, at 1 (describing that "the chip is not an isolated island" and "must communicate with other chips in a circuit through an Input/Output (I/O) system of interconnects" and that the major functions of electronic package include "to distribute the signals on to and off of the silicon chip")).

That signal contact areas 5 fall in the latter category is reinforced by Pape's structural separation of the two: signal contact areas 5 are connected to contact pads 29 of wiring substrate 27 by thin bonding wires 30 that are 15 µm to 50 µm in diameter and gold, suited to low-current signal transmission, while supply contact areas 6 are coupled (through the annular supply collective electrodes 14 and15) to thick bonding wires 31 that are 50 µm to 600 µm in diameter and aluminum, suited to high-current supply distribution. EX1005, 8:1-14, Fig. 1; EX1003, ¶159. The POSITA would accordingly have understood Pape's signal contact areas 5 for

semiconductor chip 4 to be *data input and output pads for the semiconductor die* within the meaning of the '189 Patent's claims. EX1003, ¶159.

Finally, Pape's signal contact areas 5 (*the data input and output pads*) are electrically connected via bonding wires 30 to contact pads 29 (*being electrically connected by data wire bonds to the external connectors*). EX1005, 7:45-8:51, Fig. 1; EX1003, ¶160. Bonding wires 30 form *data wire bonds* because they are the bonding wires that exclusively carry data signals between signal contact areas 5 of semiconductor chip 4 and contact pads 29 of wiring substrate 27. *See* EX1005, 8:3-4 ("only electrical signals can be passed from and to the semiconductor chip 4 via said bonding wires 30"); 7:45-8:51, Fig. 1; Section III.B.1.ii (element 1[a]); EX1003, ¶160.

Pape therefore discloses or at least renders obvious claim 8. EX1003, ¶161.

### 9. Claim 9

Pape discloses or at least renders obvious Claim 9. EX1003, ¶162.

> **i.    [9a]: The semiconductor die package of claim 8, wherein the power rail wire bonds are least twice the diameter of data wire bonds.**

Pape discloses or at least renders obvious this limitation. See EX1005, 7:45-8:51; EX1003, ¶163. As discussed in Section III.B.4 (Claim 4), Pape's bonding wires 31 form *the power rail bonds*. Section III.B.4 (Claim 4). As discussed in

Section III.B.8 (Claim 8), Pape's bonding wires 30 form *data wire bonds*. Section III.B.8 (Claim 8).

The bonding wires 31 (*the power rail bonds*) are described by Pape as being "thick" bonding wires 31, and the bonding wires 30 (*data wire bonds*) are described by Pape as being "thin" bonding wires 30. EX1005, 7:62-8:14. Pape expressly discloses the diameters of bonding wires 31 and bonding wires 30: "thick bonding wires 31 are made of aluminum and have a diameter from 50 μm and 600 μm" (EX1005, 8:7-14), while "thin" bonding wires 30 "may be constructed from thin gold wires having a thickness from 15 μm to 50 μm" (EX1005, 7:62-8:7). As such, Pape explicitly discloses an example in which bonding wires 31 (*the power rail bonds*) have a diameter of 600 μm, and bonding wires 30 (*data wire bonds*) have a diameter of 15 μm. EX1005, 7:62-8:14; EX1003, 164. In this example, twice the diameter of bonding wires 30 (*data wire bonds*) would be 30 μm because 2 * 15 μm = 30 μm. *Id.* The diameter of bonding wires 31 (*the power rail bonds*) in this example is 600 μm, which is more than 30 μm. *Id.* As such, in this example, Pape discloses that the 600 μm diameter of bonding wires 31 (*wherein the power rail wire bonds*) is at least twice the 15 μm diameter of bonding wires 30 (*are least twice the diameter of data wire bonds*). *Id.*

Pape therefore discloses or at least renders obvious claim 9. EX1003, ¶165.

10.    **Claim 10**

Pape discloses or at least renders obvious Claim 10. EX1003, ¶166.

i.    **[10a]: The semiconductor die package of claim 2, wherein the first power rail pad is a frame that encloses the second power rail pad.**

Pape discloses or at least renders obvious this limitation. *See* EX1005, 9:64-67; Fig. 1. As discussed in Section III.B.2 (Claim 2), Pape's annular supply collective electrode 14 forms *the first power rail pad* and Pape's annular supply collective electrode 15 forms *the second power rail pad*. Section III.B.2 (Claim 2). As shown by Figure 1, annular supply collective electrode 14 is an "outer" electrode that forms an "open ring" around the "inner" annular supply collective electrode 15 that is a "closed ring." EX1005, 8:27-43 Fig. 1.



**EX1005, Fig. 1 (annotated)**

Indeed, outer annular supply collective electrode 14 (*the first power rail pad*) is an annular structure (*is a frame*) that encloses inner annular supply collective electrode 15 (*that encloses the second power rail pad*), with inner annular supply collective electrode 15 sitting concentrically within outer annular supply collective electrode 14 on the active top side 11 of semiconductor chip 4. *See* EX1005, 5:11-31, 6:1-15, 7:45-8:43, Fig. 1. The POSITA would have understood or at least found obvious that outer annular supply collective electrode 14 is a *frame that encloses* inner annular supply collective electrode 15 within the meaning of the '189 Patent claims because outer annular supply collective electrode 14 is an "annular" (i.e., frame-shaped)

structure that surrounds inner annular supply collective electrode 15 on all sides —

i.e., the inner electrode is geometrically enclosed within the outer electrode. *Id.*;

EX1003, ¶169.

Pape therefore discloses or at least renders obvious claim 10. EX1003, ¶170.

### 11.    Claim 11

Pape discloses or at least renders obvious Claim 11. EX1003, ¶171.

> **i.    [11a]: The semiconductor die package of claim 1, wherein the die connection pads are integral with the semiconductor die and wherein the power rail pad is a non-circuit node of the semiconductor die.**

Pape discloses or at least renders obvious this limitation. See EX1005, 5:65-6:2; 6:50-54; 3:18-26, 7:45-8:51; EX1003, ¶172.

As discussed in Section III.B.1.iii (element 1[b]), Pape's signal contact areas 5 and supply contact areas 6 form *the die connection pads* as claimed. Section III.B.1.iii (element 1[b]). Moreover, Pape's annular supply collective electrode 14 and annular supply collective electrode 15 form *the power rail pad* as claimed, and Pape's semiconductor chip 4 forms *the semiconductor die* as claimed. Sections III.B.1.iii (element 1[b])-III.B.1.iv (element 1[c]).

A POSITA would have understood or at least found obvious that signal contact areas 5 and supply contact areas 6 (*the die connection pads*) are integral with semiconductor chip 4 (*are integral with the semiconductor die*). EX1005, 7:45-8:43, Fig. 1; EX1003, ¶174. That the die connection pads are fabricated as a part of the

semiconductor chip circuitry on the wafer has been standard practice for decades. EX1003 at 174 (citing EX1006, 16 (describing as early as the late sixties, integrated circuits included "terminals on the surface of the chip")). In addition, Pape explains how the annular supply collective electrode 14 and annular supply collective electrode 15 are bonded to the semiconductor chip 4 "after the individual integrated circuit elements have been produced on the semiconductor wafer." EX1005, 6:39-51. The POSITA would have understood that signal contact areas 5 and supply contact areas 6 are among these individual integrated circuit elements produced on the semiconductor wafer. EX1003, ¶174. Thus, the signal contact areas 5 and supply contact areas 6 are such "integrated circuit elements" that are formed on semiconductor chip 4 before electrodes 14 and 15 are bonded to the chip. *Id.*; EX1003, 174.

Additionally, annular supply collective electrode 14 and annular supply collective electrode 15 are not circuit nodes of semiconductor chip 4 (*wherein the power rail pad is a non-circuit node of the semiconductor die*), and a POSITA would have further understood or found obvious as much. EX1005, 7:45-8:43, Fig. 1; EX1003, ¶175. This is because annular supply collective electrode 14 and annular supply collective electrode 15 are not formed as part of the integrated circuitry of semiconductor chip 4, but are instead separately fabricated "metal rings made of a metal foil or a metal foil on a carrier that are adhesively bonded or soldered on in

the inner region of the top side of the semiconductor chip." EX1005, 6:1-10. Indeed, as noted above, annular supply collective electrode 14 and annular supply collective electrode 15 may be "soldered or adhesively bonded directly onto a semiconductor wafer after the individual integrated circuit elements have been produced on the semiconductor wafer." *Id.* at 6:47-51. And annular supply collective electrode 14 and annular supply collective electrode 15 are further "affixed in an electrically insulat[ed] manner on the top side" of semiconductor chip 4. *Id.* at Abstract. At least these disclosures of Pape confirm that annular supply collective electrode 14 and annular supply collective electrode 15 are not integrated nodes of semiconductor chip 4's circuitry, but are instead structurally and electrically separate components mounted onto the chip's active surface. EX1003, ¶176. The POSITA would accordingly have understood or at least found obvious that Pape's annular supply collective electrode 14 and annular supply collective electrode 15 are not circuit nodes of semiconductor chip 4 (*wherein the power rail pad is a non-circuit node of the semiconductor die*). EX1003, ¶176.

Pape therefore discloses or at least renders obvious claim 11. EX1003, ¶177.

### 12.    Claim 12

Pape discloses or at least renders obvious Claim 12. EX1003, ¶178.

i.      **[12a]: The semiconductor die package of claim 1, wherein the semiconductor die support is a non-conductive substrate.**

Pape discloses or at least renders obvious this limitation. EX1005, 1:60-2:4, 2:66-3:65, 4:11-25, 5:44-58, 6:1-51, 7:15-23, 7:45-8:51, 9:67-10:5, Fig. 1; EX1003, ¶179. As discussed for Section III.B.1.ii (element 1[a]), Pape's wiring substrate 27 form *the semiconductor die support* as claimed. Section III.B.1.ii (element 1[a]). Wiring substrate 27 carries electrically distinct contact pads 29 and supply contact pads 32, each of which serves as a separate, electrically isolated path for signals or supply potentials between semiconductor chip 4 and the outside of the package. EX1005, 7:45-8:51, Fig. 1; EX1003, ¶179. As is well known to the POSITA, wiring substrate 27 (*the semiconductor die support*) must be a non-conductive substrate (*is a non-conductive substrate*) because if it were not, the multitude of contact pads 29 and 32 would be electrically shorted together, making it impossible to deliver independent signals to and from semiconductor chip 4 using these pads, and impossible to maintain the separation between the supply and ground potentials carried by these pads. EX1003, ¶179; EX1005, 1:60-2:4, 2:66-3:65, 4:11-25, 5:44-58, 6:1-51, 7:15-23, 7:45-8:51, 9:67-10:5, Fig. 1; *see* Sections III.B.3 (Claim 3), Sections III.B.5 (Claim 5). Moreover, Pape itself even uses the term "substrate" to describe "wiring substrate 27;" "substrate" is a term of art in the semiconductor packaging field that refers to a non-conductive base material, such as a printed circuit

board substrate, ceramic substrate, or BT laminate, that carries patterned conductive traces and contact pads. *See, e.g.,* EX1003, ¶179 (citing EX1008, 30-31 & Fig. 1.37 (showing a "BT epoxy substrate" of a plastic ball grid array package); EX1006, 83-86 (providing a table of "electrical properties of substrate materials in use in 1995 . . . for insulating materials")). As such, in view of the above, the POSITA would have understood or at least found obvious that wiring substrate 27 (*the semiconductor die support*) is a *non-conductive substrate*. EX1003, 179.

Pape therefore discloses or at least renders obvious claim 12. EX1003, ¶180.

### 13.    Claim 13

Pape discloses or at least renders obvious Claim 13. EX1003, ¶181.

> i.    **[13a]: The semiconductor die package of claim 1, wherein the semiconductor die support is a lead frame.**

Pape discloses or at least renders obvious this limitation. See EX1005, 2:62-65, 3:13-65, 5:11-43; EX1003, ¶182. As discussed for Section III.B.1.ii (element 1[a]), Pape's wiring substrate 27 forms *the semiconductor die support*. Section III.B.1.ii (element 1[a]). However, Pape expressly discloses, as an alternative to the wiring substrate 27 embodiment relied on above with respect to element 1[a], that the die support of semiconductor device 1 may be implemented as a "flat conductor leadframe." EX1005, 2:62-65 (explaining "[t]he present invention reduces the number of supply connections externally toward **a substrate or toward a flat**

**conductor leadframe**, so that more space is created for signal connections"), 3:13-65 (referring to "wiring substrate" and "flat conductor leadframe" interchangeably), 5:11-43 (same) (emphasis added). Pape's disclosure of the flat conductor leadframe alternative is not a separate or untethered embodiment—it is presented throughout Pape as an interchangeable die support that performs the same function as wiring substrate 27 in carrying the chip's external connections out of the package. *Id.*; EX1003, ¶182. The POSITA would have understood that in Pape's leadframe embodiment, the leadframe would have performed the same die support function of wiring substrate 27, consistent with well-known leadframes as used in typical plastic packaging, as shown in the figure below from EX1007. EX1003, at 182.



Figure 10-4. Typical Plastic Package Construction (From Ref. 1.)

**EX1007, Fig. 10-4.**

The POSITA would accordingly have understood or at least found obvious that Pape discloses the use of a flat conductor leadframe as the die support of its semiconductor device 1 instead of wiring substrate 27, and in such an arrangement, the flat conductor leadframe (*the semiconductor die support*) *is a lead frame* within the meaning of the '189 Patent's claims. EX1003, ¶183.

Pape therefore discloses or at least renders obvious claim 13. EX1003, ¶184.

### 14.    Claim 14

Pape discloses or at least renders obvious Claim 14. EX1003, ¶185.

> **i.      [14a]: The semiconductor die package of claim 1, further including an encapsulating material covering the semiconductor die and die wire bonds.**

Pape discloses or at least renders obvious this limitation. *See* EX1005, 7:46-50; 9:24-34; Fig. 3; EX1003, ¶186.

As discussed for Sections III.B.1.ii (element 1[a]) and III.B.1.v (element 1[d]), Pape's semiconductor chip 4 forms *the semiconductor die* and bonding wires 20 form *die wire bonds*. Sections III.B.1.ii (element 1[a]), III.B.1.v (element 1[d]). As discussed in Section III.B.1.i (element 1[p]), Pape's "plastic housing" encapsulates Pape's semiconductor device 1 and forms the claimed *semiconductor die package*, and a POSITA would have understood or at least found obvious that (1) Pape's Figure 1 embodiment uses the same or similar packaging as shown by Figure 3 to encapsulate its semiconductor chip 4 and wiring substrate 27, and (2)

Pape's Figure 3 depicts a cross-section of a semiconductor chip 4 within a housing (identified by numeral 25) that would be the same or similar to a cross-section of semiconductor chip 4 in Figure 1, and shows that the semiconductor chip is mounted on top of wiring substrate 27. Section III.B.1.i (element 1[p]); EX1003, 187.



**EX1005, Fig. 3 (annotated)**

As shown by Figure 3, the semiconductor housing 25 encapsulates and covers (*further including an encapsulating material covering*) semiconductor chip 4 (*the semiconductor die*) and shortened bonding wires 20 (*die wire bonds*). EX1005, 7:33-61, 8:52-9:49, Figs. 1-3; EX1003, ¶188. Indeed, Pape explains that the semiconductor chip 5 and "internal connecting elements 16" that are "made of shortened bonding wires 20" are "embedded" in semiconductor housing 25. EX1005, 8:33-36, 9:32-49. The POSITA would accordingly have understood or at least found obvious that semiconductor housing 25 includes an encapsulating

material that covers both semiconductor chip 4 and the shortened bonding wires 20 (*further including an encapsulating material covering the semiconductor die and die wire bonds*) within the meaning of the '189 Patent claims. EX1003, ¶188 (citing EX1007, 397-398 & Fig. 10-4 (confirming it was well-known to add "plastic epoxy-encapsulating material to protect the chip and the wire interconnects")).

Pape therefore discloses or at least renders obvious claim 14. EX1003, ¶189.

### 15. Claim 15

Pape discloses or at least renders obvious Claim 15. EX1003, ¶190.

#### i.     15[p] A semiconductor die, comprising:

*See* Sections III.B.1.i (element 1[p]), III.B.1.iii (element 1[b]).

#### ii.     15[a]: a die support mounting surface and an opposite die connection pad surface with associated die connection pads, wherein the die connection pads are circuit nodes of the semiconductor die; and

*See* Section III.B.1.iii (element 1[b]).

#### iii.     15[b]: at least one power rail pad on the die connection pad surface, the power rail pad having a surface area larger than surface areas of the die connection pads,

*See* Section III.B.1.iv (element 1[c]).

#### iv.     15[c]: wherein the die connection pads are integral with the semiconductor die and wherein the power rail pad is a non-circuit node of the semiconductor die.

*See* Section III.B.11 (Claim 11).

### 16. Claim 16

Pape discloses or at least renders obvious Claim 16. EX1003, ¶195.

    i.    **[16a]: The semiconductor die of claim 15, wherein the least one power rail pad includes a first power rail pad and a second power rail pad, wherein the first power rail pad is a frame that encloses the second power rail pad.**

Pape discloses or at least renders obvious *wherein the least one power rail pad includes a first power rail pad and a second power rail pad* for the same reasons discussed in Section III.B.2 (Claim 2). *See* Section III.B.2 (Claim 2). Pape further discloses *wherein the first power rail pad is a frame that encloses the second power rail pad* for the same reasons discussed in Section III.B.10 (Claim 10). *See* Section III.B.10 (Claim 10).

### 17. Claim 17

Pape discloses or at least renders obvious Claim 17. EX1003, ¶197.

    i.    **[17a]: The semiconductor die of claim 15, further comprising die wire bonds electrically coupling the power rail pad to at least two of the die connection pads.**

*See* Section III.B.1.v (element 1[d]).

### 18. Claim 18

Pape discloses or at least renders obvious Claim 18. EX1003, ¶199.

    i.    **[18a]: The semiconductor die of claim 17, wherein the least one power rail pad includes a first power rail pad and a second power rail pad, each**

> **individually coupled by the die wire bonds to at least two of the die connection pads.**

*See* Section III.B.2 (Claim 2).

### 19.    Claim 19

Pape discloses or at least renders obvious Claim 19. EX1003, ¶201.

#### i.    19[p] A method for assembling a semiconductor die package, the method including:

*See* Section III.B.1.i (element 1[p]). Moreover, Pape expressly discloses *[a]*
*method for assembling a semiconductor package* because it describes a method of assembling its semiconductor device 1, including a sequence of steps for producing the chip, applying supply collective electrodes, mounting the chip to a wiring substrate or leadframe, forming bonding-wire connections, and embedding the assembly in a semiconductor housing. *Id.*; EX1005, 2:62-3:47, 5:32-43, 6:16-7:23; 8:43-51, Fig. 1. The POSITA would have understood that Pape's disclosure of the assembled semiconductor device 1, together with Pape's express description of the steps by which semiconductor devices are assembled, discloses or at least renders obvious *[a] method for assembling a semiconductor package* within the meaning of the '189 Patent's claims. EX1003, ¶202.

#### ii.    19[a]: providing a semiconductor die support with external connectors;

*See* Section III.B.1.ii (element 1[a]). Moreover, Pape explains that its wiring substrate 27 (*semiconductor die support*) is *provid[ed]* because Pape's wiring

substrate 27 must be provided before semiconductor chip 4 can be mounted to it and before the bonding-wire connections to its pads can be formed. *See* EX1005, 1:43-2:4, 2:59-3:12, 7:45-8:51, 9:32-10:5, Figs. 1-4; EX1003, ¶203; *see also* Section III.B.1.iii (element 1[b]).

> iii.    **19[b]: providing a semiconductor die with a die support mounting surface and an opposite die connection pad surface with associated die connection pads, the connection pads being circuit nodes of the semiconductor die, wherein there is at least one power rail pad on the die connection pad surface, the power rail pad having a surface area larger than surface areas of the die connection pads;**

*See* Sections III.B.1.iii (element 1[b]), III.B.1.iv (element 1[c]). Moreover, Pape explains that its semiconductor chip 4 (*semiconductor die*) having an underside surface for mounting to wiring substrate 27 (*with a die support mounting surface*) and the active top side 11 having signal contact areas 5 and supply contact areas 6 (*and an opposite die connection pad surface with associated die connection pads*) and annular supply collective electrode 14 and annular supply collective electrode 15 (*at least one power rail pad on the die connection pad surface*) is *provid[ed]* because the annular supply collective electrodes 14 and 15 are applied to the chip at the wafer level: "the supply collective electrodes…are soldered or adhesively bonded directly onto a semiconductor wafer **after the individual integrated circuit elements have been produced on the semiconductor wafer**." EX1005, 6:46-51 (emphasis added)*,* 6:1-15, 6:52-58. The POSITA would have understood that this

wafer-level application of the annular supply collective electrodes yields a semiconductor chip 4 that is *provided* as claimed, ready for subsequent mounting to wiring substrate 27. EX1003, ¶204.

> ### iv.      19[c]: mounting the semiconductor die to the die support at the die support mounting surface;

*See* Section III.B.1.iii (element 1[b]). Moreover, Pape discloses *mounting* semiconductor chip 4 at its underside surface to wiring substrate 27 (*the semiconductor die to the die support at the die support mounting surface*), such that the semiconductor chip 4 mounted onto wiring substrate 27 results, as discussed in Section III.B.1.iii (element 1[b]). The POSITA would have understood that arriving at the mounted assembly necessarily requires the step of mounting semiconductor chip 4 to wiring substrate 27 at semiconductor chip 4's underside surface. EX1003, ¶205.

> ### v.      19[d]: electrically coupling the power rail pad to at least two of the die connection pads by die wire bonds;

*See* Section III.B.1.v (element 1[d]).

> ### vi.      19[e]: electrically coupling the power rail pad to at least one of the external connectors by power rail wire bonds;

*See* Section III.B.4 (Claim 4).

> **vii.**    **19[f]: electrically coupling some of the die connection pads to the external connectors by data wire bonds; and**

*See* Section III.B.8 (Claim 8).

> **viii.**    **19[g]: encapsulating the semiconductor die, power rail wire bonds, die wire bonds and data wire bonds.**

*See* Section III.B.14 (Claim 14). Moreover, as shown by Figure 3, the semiconductor housing 25 encapsulates, embeds, and covers (*encapsulating*) semiconductor chip 4 (*the semiconductor die*), bonding wires 31 (*power rail wire bonds*), bonding wires 20 (*die wire bonds*), and bonding wires 30 (*data wire bonds*) which are a type of the connecting elements 12 shown in Figure 3. *Id.*; EX1005, 7:62-63 ("connecting elements 12 are bonding wires 30 and 31"),7:45-8:51, 8:52-9:49, Figs. 1-3; EX1003, ¶209 (confirming that it was well-known to the POSITA to encapsulate the die with "plastic epoxy-encapsulating material to protect the chip and the wire interconnects," citing EX1007, 397-398 & Fig. 10-4).



**EX1005, Fig. 3 (annotated)**

20.    **Claim 20**

Pape discloses or at least renders obvious Claim 20. EX1003, ¶210.

> i.    **[20a]: The method for assembling a semiconductor die package of claim 19, wherein the die connection pads are integral with the semiconductor die, and wherein the power rail pad is a non-circuit node of the semiconductor die.**

*See* Section III.B.11 (Claim 11).

## IV.  CONCLUSION

Requester respectfully submits that the cited references render Claims 1-20 of the '189 Patent unpatentable, thereby raising SNQs regarding these claims. EX1003, ¶213. *Ex parte* reexamination should be commenced and Claims 1-20 found unpatentable.

Respectfully submitted,
BAKER BOTTS L.L.P.

Date: May 27, 2026

/Jeffery S. Becker/
Jeffery Becker (Reg. No. 68,533)
**BAKER BOTTS L.L.P.**
2001 Ross Avenue Suite 900
Dallas, Texas 75201-2980
Phone: 214-953-6526

ATTORNEY FOR REQUESTER
STMicroelectronics, Inc.

516594055.4    103