**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | |
|---|---|
| CHIP PACKAGING TECHNOLOGIES, LLC, <br><br> *Plaintiff,* <br><br> v. <br><br> STMICROELECTRONICS, INC., <br><br> *Defendant.* | Civil Action No. 7:25-cv-00505-DC-DTG <br><br><br> **JURY TRIAL DEMANDED** |

**PLAINTIFF CHIP PACKAGING TECHNOLOGIES, LLC'S
RESPONSIVE CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................................. 1

II.  LEGAL STANDARD.......................................................................................................... 1

III.  AGREED TERMS .............................................................................................................. 3

IV.  DISPUTED TERMS............................................................................................................ 3

   A.  U.S. Patent No. 9,685,351............................................................................................ 3

      1.  "positive mold lock structure" ............................................................................... 3

      2.  "laterally protrude above the top surface" .............................................................. 7

   B.  U.S. Patent No. 9,299,646............................................................................................ 9

      1.  "said area"................................................................................................................ 9

      2.  "disposed between . . . the plurality of signal leads and the first side of the power
bar" ....................................................................................................................... 10

   C.  U.S. Patent No. 9,263,299.......................................................................................... 12

      1.  "temporary carrier" .............................................................................................. 12

      2.  "each of said active device die having a solderable conductive surface on its
underside"............................................................................................................. 15

      3.  "mounting . . . dispensing . . . attaching . . . and reflowing . . ."................................. 17

   D.  U.S. Patent No. 8,643,189.......................................................................................... 19

      1.  "power rail pad"..................................................................................................... 19

      2.  "opposite die connection pad surface"................................................................. 22

V.  CONCLUSION.................................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Innovative Props. Co. v. Tredegar Corp.*,
725 F.3d 1315 (Fed. Cir. 2013)........................................................................................3, 19, 23

*Altiris, Inc. v. Symantec Corp.*,
318 F.3d 1363 (Fed. Cir. 2003)................................................................................................17, 18

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp.*,
262 F.3d 1258 (Fed. Cir. 2001)........................................................................................................6

*Energizer Holdings, Inc. v. ITC*,
435 F.3d 1366 (Fed. Cir. 2006)......................................................................................................12

*Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*,
156 F.4th 1259 (Fed. Cir. 2025) .......................................................................................................2

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
750 F.3d 1304 (Fed. Cir. 2014)......................................................................................................2, 5

*Hologic, Inc. v. SenoRx, Inc.*,
639 F.3d 1329 (Fed. Cir. 2011)........................................................................................................8

*Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996).........................................................................................................................1

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995)............................................................................................................2

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014).......................................................................................................................12

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc)..................................................................................1, 2, 3

*Polaris PowerLED Techs., LLC v. Dell Techs., Inc.*,
No. 1:22-CV-973-RP, 2025 WL 2525457 (W.D. Tex. Mar. 10, 2025)......................................2

*Proxense, LLC v. Microsoft Corp.*,
No. W-23-CV-00319-ADA, 2024 WL 2703020 (W.D. Tex. May 24, 2024) ...........................2

*Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*,
853 F.3d 1370 (Fed. Cir. 2017)......................................................................................................14

*Salazar v. Procter & Gamble Co.*,
414 F.3d 1342 (Fed. Cir. 2005)..................................................................................19

*Sinorgchem Co., Shandong v. ITC*,
511 F.3d 1132 (Fed. Cir. 2007)..................................................................................21

*Tandon Corp. v. ITC*,
831 F.2d 1017 (Fed. Cir. 1987)............................................................................13, 20

*Thorner v. Sony Comput. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012).......................................................................... *passim*

*ThroughPuter, Inc. v. Amazon Web Servs., Inc.*,
No. 1:22-CV-1095-DAE, 2025 WL 2946606 (W.D. Tex. Sept. 9, 2025)................................2

*U.S. Surgical Corp. v. Ethicon, Inc.*,
103 F.3d 1554 (Fed. Cir. 1997)..................................................................................10

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)............................................................................16, 17

iii

## I.    INTRODUCTION

Defendant STMicroelectronics, Inc.'s ("ST") Opening Claim Construction Brief ("Def. Br.," Dkt. 42) asks this Court to adopt constructions that systematically seek to narrow or rewrite clear claim language, import limitations from embodiments, and treat exemplary language and prosecution remarks as wholesale surrender of claim scope. Each of ST's proposals should be rejected. The pattern across the nine disputed terms is consistent: ST asks the Court to add negative and functional limitations that appear nowhere in the claims, to restate claim language back to the jury as a "construction," and to impose a step order the claims do not recite. That is not claim construction; it is non-infringement advocacy reverse-engineered into proposed constructions.

For seven of the nine disputed terms, no construction is necessary; the plain and ordinary meaning controls. For two terms—"positive mold lock structure" and "power rail pad"—Plaintiff Chip Packaging Technologies, LLC ("Chip Packaging") proposes a construction grounded in the structural characteristic that consistently defines the element throughout the specification. In each instance, the dispute reduces to whether ST has met the demanding standard for departing from ordinary meaning. It has not.

The Court should adopt Chip Packaging's proposed constructions for each disputed term and the parties' agreed constructions for the two agreed terms.

## II.    LEGAL STANDARD

Claim construction is a matter of law "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). The words of a claim "are generally given their ordinary and customary meaning" as understood by "a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) (internal quotations and citations omitted). In construing patent claims, courts should start with the language of the claims themselves, giving terms "their ordinary and customary meaning," which is "the meaning that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13.

1

Claims "must be read in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). Courts "should also consider the patent's prosecution history" in construing claim terms. *Phillips*, 415 F.3d at 1317 (internal citation omitted). The claim language, specification, and prosecution history constitute the intrinsic evidence.

The Federal Circuit applies a "heavy presumption that claim terms carry their full ordinary and customary meaning." *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*, 156 F.4th 1259, 1273 (Fed. Cir. 2025) (internal quotations and citation omitted); *accord Proxense, LLC v. Microsoft Corp.*, No. W-23-CV-00319-ADA, 2024 WL 2703020, at *1 (W.D. Tex. May 24, 2024). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *see also, e.g.*, *ThroughPuter, Inc. v. Amazon Web Servs., Inc.*, No. 1:22-CV-1095-DAE, 2025 WL 2946606, at *2 (W.D. Tex. Sept. 9, 2025) (citing *Thorner*); *Polaris PowerLED Techs., LLC v. Dell Techs., Inc.*, No. 1:22-CV-973-RP, 2025 WL 2525457, at *2 (W.D. Tex. Mar. 10, 2025) (citing *Thorner*); *Proxense*, 2024 WL 2703020, at *1 (citing *Thorner*).

"The standards for finding lexicography and disavowal are exacting." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). To act as a lexicographer, "[i]t is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments"; instead, a patentee "must clearly express an intent to redefine the term." *Thorner*, 669 F.3d at 1365 (internal quotation and citation omitted). To provide a clear disavowal of claim scope, a patentee "may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction . . . ." *Id*. at 1366 (citation omitted). "Mere criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal." *Id*. (citations omitted). "It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation." *Id*. "We do not read limitations from the

specification into claims; we do not redefine words. Only the patentee can do that." *Id*. When "an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

Courts may also consider "extrinsic evidence," including expert testimony, dictionaries, and learned treatises, to better understand the technical field and understand what a person of skill in the art would understand claim terms to mean. *See Phillips*, 415 F.3d at 1317. Extrinsic evidence is of less significance than the intrinsic record, *see id*. at 1317–24, and it may not be used "to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Id*. at 1324.

## III. AGREED TERMS

The parties have reached agreement on the construction of the following terms. Chip Packaging requests that the Court enter these agreed constructions.

| Claim Term | Patent/Claims | Agreed Construction |
|---|---|---|
| "the ground bar having a first portion . . . and a second portion" | '646 Patent, Claims 1, 5–7, 11 | Plain and ordinary meaning which refers to two portions of the same ground bar |
| "diaphragm" | '658 Patent, Claim 1 | "a separate element that is disposed over the gel and between the gel and the lid" |

## IV. DISPUTED TERMS

For the Court's and the parties' convenience, Plaintiff Chip Packaging addresses the claim terms in the order set forth in Defendant ST's opening brief rather than in the order set by the Order Governing Proceedings (OGP).

### A. U.S. Patent No. 9,685,351

#### 1. "positive mold lock structure"

U.S. Patent No. 9,685,351 (the "'351 Patent"; Dkt. 42-1) generally relates to methods and structures for the packaging of integrated circuits to protect interior components from delamination. The '351 Patent describes and claims various techniques to reduce delamination,

3

including the formation of mechanical mold locking features on the lead frame of a semiconductor die. *See, e.g.*, claim 1. The parties dispute the construction of two claim phrases, both of which appear in independent claim 1: "positive mold lock structure" and "laterally protrude above the top surface."

| Claim Term | Patent/Claims | Plaintiff Chip Packaging's Construction | Defendant ST's Construction |
|---|---|---|---|
| "positive mold lock structure" (Claims 1–3) | '351 Patent, Claims 1–3 | "raised mechanical locking features" | "raised (not etched, stamped, or recessed) mechanical locking features" |

The parties largely agree on the substance of this term: a "positive mold lock structure" means "raised mechanical locking features," and that is Plaintiff Chip Packaging's construction. Defendant ST's construction seeks to add the limitation "(not etched, stamped, or recessed)." As described below, the claimed locking structures are consistently described as raised, mechanical locking features. ST's additional limitations should be rejected because the specification does not unmistakably define the term that way, nor does it clearly surrender claim scope.

The specification describes that "[i]n selected embodiments, the mechanical mold locking feature is formed with one or more *raised* structures extending above the lead frame assembly and/or die flag . . . to provide a mechanical engagement surface to securely lock the encapsulation package to the lead frame or PCB substrate assembly." '351 Pat., 2:29–35 (emphasis added). Consistent with that disclosure, the specification discloses various mechanical locking structures that are raised, thereby allowing molding (or adhesive) compound to flow under for secure locking. *See, e.g.*, '351 Pat. at 4:26–29 ("For example, formation of the wire wedge bond loops 114 as aluminum wire loops provides a low loop height and allows the mold compound to flow under the loops for secure locking."); *id*. at 4:30–31 (emphasis added) ("However, other *raised* structures may be used to form the *mechanical mold locking feature* . . ."); *id*. at 5:61–63 (emphasis added) ("*Raised* above the surface of the lead frame 104, the surfaces of the stud bumps 214 provide mold

4

compound locking benefits . . .”); *id.* at 6:23–25 (emphasis added) (“As formed, the mold lock structures are ***raised (not half-etched) mechanical locking features*** . . .”); *id.* at 6:59–61 (emphasis added) (“As formed, the cross-section shape of the wire bond locks will provide a ***raised*** and laterally protruding structural contour for secure mold compound locking.”); *id.* at 7:25–29 (emphasis added) (“In selected embodiments, the mold lock may be formed with one or more wire wedge bond loops or chains formed on the substrate structure as ***raised mechanical locking features*** to prevent delamination . . .”); *id.* at 7:29–32 (emphasis added) (“In other embodiments, the mold lock may be formed with one or more stud bumps formed on the substrate as ***raised mechanical locking features*** to prevent delamination . . .”).

ST’s proposed construction adds the parenthetical qualifier “(not etched, stamped, or recessed).” ST argues that these limitations should be imported into the claims because (1) the patentee acted as his own lexicographer and explicitly defined the phrase this way and (2) the patentee clearly disavowed claim scope. Def. Br. at 3, 4. Both arguments should be rejected. ST’s further observation that the term is “coined” changes nothing: the parties agree on what the term affirmatively means—“raised mechanical locking features”—and the applicant itself told the Examiner that “[b]y the very nature of the term,” the claims require “forming a structure on the lead frame top surface which positively protrudes above the lead frame top surface and which locks with mold.” Dkt. 42, Ex. E at 121–22 (emphasis omitted). Chip Packaging’s construction captures exactly that meaning. The only genuine dispute is ST’s added negative limitation.

First, the standard for lexicography is “exacting,” and it has not remotely been met here. *GE Lighting Sols.*, 750 F.3d at 1309. As the Federal Circuit has explained, to act as a lexicographer, “[i]t is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments,” instead, a patentee “must clearly express an intent to redefine the term.” *Thorner*, 669 F.3d at 1365 (internal quotation and citation omitted). Chip Packaging recognizes that, in describing the two illustrated embodiments, the specification twice states that the exemplary structures are “formed on the die flag 104 as raised (not etched, stamped, or recessed) mechanical locking features.” ’351 Pat. at 3:37–39 (wire wedge bond loops 114); *id.* at

5

5:43–47 (stud bumps 214-215). Both sentences begin with the phrase "[a]s formed" and describe specific, numbered embodiment structures—they narrate how the depicted examples are made, and describing embodiments does not redefine a claim term. *Thorner*, 669 F.3d at 1366 ("We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that.").

Indeed, in many other passages, the specification describes the claimed structures simply as "raised"—without any reference to etching, stamping, or recessing. *See* '351 Pat. at 2:29–35, 4:26–29, 4:30–31, 5:61–63, 6:23–25, 6:59–61, 7:25–29, 7:29–32. ST's implied-lexicography theory fails on its own terms: the third passage ST characterizes as using "the same words" (Def. Br. at 5) in fact uses *different* words—"raised (not half-etched) mechanical locking features"—yet another parenthetical. '351 Pat. at 6:23–30. Definition by implication requires that the patentee use a term "in a manner consistent with only a single meaning." *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001). Shifting parentheticals are the opposite of a single consistent definition. As such, no clear, express intent to redefine the term exists. *Thorner*, 669 F.3d at 1365.

Second, no clear disavowal of claim scope exists that would justify ST's proposed construction. "Mere criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal." *Thorner*, 669 F.3d at 1366 (citation omitted). ST relies heavily on a single passage of the specification at '351 Pat. 5:7–14, which discusses "conventional approaches which use etched, stamped, or recessed features in the lead frame/die flag." But that discussion goes on to describe that the claimed inventions include a "laterally protruding element," which is a different limitation than at issue here. *See id.* at 5:10–11. More fundamentally, contrasting an embodiment with conventional prior-art approaches is not a definitional statement or a disavowal of claim scope—it is an explanation of the invention's advantages. The passage's own words confirm its embodiment-specific scope: it describes what "the wire wedge bond loop structures described herein provide"—the illustrated wire-loop structures, not the metes and bounds of the claim term. Def. Br. at 4 (quoting '351 Pat. at 5:7–14).

6

Likewise, ST's citation to the prosecution history (Def. Br. at 5) actually supports Chip Packaging's proposed construction: the applicant described the claimed "positive mold lock structures" as "forming a structure on the lead frame top surface which positively protrudes above the lead frame top surface and which locks with mold"—without any reference to or restriction regarding etching, stamping, or recessing. Dkt. 42, Ex. E at 121–22.

Finally, ST argues that the patent's description of "dam bar 108" justifies its proposed construction. Def. Br. at 6–7. But claim construction focuses on the words of the claims and the intrinsic record, not a defendant's attempt to manufacture a non-infringement position. And as described above, neither doctrine of lexicography nor disavowal applies here that would justify ST's proposed additional limitations. The Court should adopt Plaintiff Chip Packaging's proposed construction: "raised mechanical locking features."

### 2.    "laterally protrude above the top surface"

| Claim Term | Patent/Claims | Plaintiff Chip Packaging's Construction | Defendant ST's Construction |
|---|---|---|---|
| "laterally protrude above the top surface" (Claims 1–3) | '351 Patent, Claims 1–3 | Plain and ordinary meaning, *i.e.,* protrude to the side of and above the top surface | Plain and ordinary meaning which means "protrude along and above the top surface" |

Both parties agree this term should be given its plain and ordinary meaning. The dispute is over a single word: "laterally." ST relies on a dictionary definition of "lateral" that defines it as "of or relating to the side" (Dkt. 42, Ex. K). That definition aligns precisely with Chip Packaging's proposed construction ("to the side of") and contradicts ST's proposed substitution ("along"). The word "along" does not appear in ST's own submitted definition.

None of ST's arguments justify departing from the plain meaning of "laterally." First, ST argues that "laterally" is potentially confusing to the jury because it appears to conflict with the claims' recitation of "above." Def. Br. at 8. But these everyday words are sufficiently clear. In

addition to the dictionary definitions, ST's brief itself acknowledges that "'laterally' connotes a sideways direction," not necessarily "along." *Id*.

Second, ST's citations to the specification do not support rewriting the word "laterally" to "along." Def. Br. at 8 (citing '351 Pat. at 2:31–34, 2:35–39, 6:58–61, Fig. 10.) In each of those disclosures, the specification uses substantially the same language as the claim—"protruding laterally" ('351 Pat. 2:33) or "laterally protruding" (*id.* 2:38, 6:60–61 and Fig. 10)—without any use or reference to the word "along."

Third, ST's attorney argument concerning the patent's drawings and embodiments is unpersuasive. For example, ST argues that the figures depict and describe the claimed inventions as allowing mold compound to "flow" under a protrusion. (Def. Br. at 9–10.) But that aspect of the inventions is already addressed in the claim language itself (and in both parties' proposed constructions), which makes clear that the claimed "positive mold lock structures" protrude "***above*** the top surface." *See* '351 Pat., claim 1 (emphasis added). No basis exists to rewrite the plain meaning of "laterally" to "along" based on these disclosures.

Fourth, ST cites *Hologic, Inc. v. SenoRx, Inc.*, 639 F.3d 1329, 1335 (Fed. Cir. 2011) for the proposition that when a relative term has no clearly stated frame of reference, the Court should supply one from the specification. Def. Br. at 10. But *Hologic* is inapplicable here because the claim itself provides the reference: the claim term is "laterally protrude above the top surface," and "the top surface" is the reference plane. A structure that extends laterally—to the side—from its base while elevated above that surface protrudes "to the side of and above" it in exactly the sense that Plaintiff Chip Packaging's construction describes. No specification-supplied gloss is needed. And even if the Court were to look to the specification for additional guidance, the specification nowhere defines "laterally protrude" to mean "along." The word "along" appears in ST's characterization of the figures, not in any definitional statement.

Finally, ST argues that Chip Packaging's "to the side of" language would exclude embodiments where the protrusion is above and along the surface. Def. Br. at 11. That is wrong. Any structure that protrudes to the side of and above the surface necessarily also extends along the

8

surface to some degree. The two descriptions are not mutually exclusive. Chip Packaging's construction simply requires a lateral component—which is all that the claim's use of "laterally" requires. By contrast, ST's "along" construction risks confusion by importing a specific geometric relationship—parallel travel along the surface—that exists in certain disclosed embodiments but that is not a requirement of the plain claim language. The Court should reject ST's proposal and adopt Chip Packaging's construction.

### B.    U.S. Patent No. 9,299,646

#### 1.    "said area"

| Claim Term | Patent/Claims | Plaintiff Chip Packaging's Construction | Defendant ST's Construction |
|---|---|---|---|
| "said area" (Claims 1, 5–7, 11) | '646 Patent, Claims 1, 5–7, 11 | No construction necessary | Plain and ordinary meaning which refers to the same area referred to earlier in the claim (the area between the [embedded portions of the] plurality of signal leads and the semiconductor die) |

U.S. Patent No. 9,299,646 (the "'646 Patent"; Dkt. 42-2) generally relates to semiconductor packaging methods and structures that are adapted to reduce noise from power structures.

The parties do not genuinely dispute what "said area" means. Both parties agree that the phrase has antecedent basis in the claims' earlier recitations of "an area . . . ." In claim 1, "said area" refers to the area "between the embedded portions of the plurality of signal leads and the semiconductor die." In claim 7, "said area" refers to the area "between the plurality of signal leads and the semiconductor die."

The dispute is whether the Court must engage in claim construction to spell out that antecedent relationship—i.e., to recite the claim language a second time in the same claim. But claim construction is not an exercise in redundancy, and there is no need for the Court to construe

9

language that is already clear. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Here, there is no dispute as to the antecedent basis of the phrase "said area" in each claim.

Indeed, construction of "said area" increases the likelihood of juror confusion. As the Court is aware, at trial the parties introduce testimony concerning infringement on an element-by-element basis, including the Court's construction for any construed terms. Repeating antecedent language—for the sake of repetition—may lead jurors to believe that additional proof of infringement is required. Furthermore, as outlined below, the parties dispute the meaning of the "between the plurality of signal leads . . . " claim phrase. ST's insistence on claim construction for "said area"—and that the Court repeat the phrase "between the plurality of signal leads . . ." as part of the construction—appears calculated to leave jurors with the impression that ST has two separate non-infringement defenses for this claim term. The antecedent basis of "said area" is already clear for each claim, and no further construction is necessary.

### 2. "disposed between . . . the plurality of signal leads and the first side of the power bar"

| Claim Term | Patent/Claims | Plaintiff Chip Packaging's Construction | Defendant ST's Construction |
|---|---|---|---|
| "disposed between [the embedded portions of] the plurality of signal leads and the first side of the power bar" (Claims 1, 5–7, 11) | '646 Patent, Claims 1, 5–7, 11 | No construction necessary | Plain and ordinary meaning which refers to "disposed in an area between *the ends* [of the embedded portions] of the signal leads and the first side of the power bar" |

Claim 1 of the '646 Patent recites a "ground bar having a first portion ***disposed between*** the embedded portions of the plurality of signal leads and the first side of the power bar," and claim 7 recites a "ground bar having a first portion ***disposed between*** the plurality of signal leads and the first side of the power bar." (Emphasis added). No construction of these phrases is necessary. The words possess readily understandable plain meanings—indeed, ST's construction

10

simply repeats the words of the claim, except that it impermissibly rewrites the single word "between" to the phrase "area between the ends" of.

The plain meaning of "between" is readily understandable. To be "between" two things is to exist, at least in part, in the space or interval separating them. ST's own dictionary definitions are consistent with this definition—and, significantly, those dictionaries do not require or suggest "the ends" of limitation that ST seeks to import. *See* Dkt. 42, Ex. L (defining "between" as "in the time, space, or interval that separates").

ST argues that the specification supports rewriting "between," but those arguments fail. The portion of the specification that describes the "ground bar"—which is the limitation at issue here—explains that "each ground bar 132 includes a first portion 132a disposed between the adjacent embedded portions 122b of the signal leads 122 and the first side 124a of the adjacent power bar 124." '646 Pat. at 3:46–49.[1] That description tracks the claim language without adding "the ends" of, confirming that no further construction is necessary or warranted. By contrast, ST relies on '646 Pat. Figure 2 and the specification at 2:62–64, but that portion of the specification describes the "signal leads," not the "ground bar" at issue here. Likewise, ST's reliance on '646 Pat. 3:5–7 is misplaced, because that portion of the specification discusses the location of the "power bar 124," not the "ground bar," which is the claim element in dispute.

ST also argues that construction of "between" is necessary in light of Chip Packaging's infringement allegations. Def. Br. at 14 (citing FAC ¶ 71). Once again, that argument demonstrates ST's true intent: ST asks the Court to resolve an infringement dispute under the guise of construction. Where the first portion of an accused ground bar sits is a question for the factfinder under the plain claim language.

---

[1] Nor can the specification supply the clarity ST's rewrite requires: ST itself concedes that the '646 Patent specification "contains a typographical error and at times incorrectly refers to the embedded ends 122a as embedded ends 122b." Def. Br. at 15 n.4. A specification ST admits is internally inconsistent on these very reference numerals is no basis for importing "the ends" of into the claim.

Finally, ST argues that its construction is necessary because it avoids an alleged indefiniteness issue. Def. Br. at 16. But that is not a proper claim construction argument; it is an invalidity defense. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910–11 (2014). A term that ST contends is clear enough to have a "plain meaning" cannot simultaneously be indefinite for failure to inform a skilled artisan of its scope. If the term has a plain meaning—as both parties propose—then the term is sufficiently definite. *Energizer Holdings, Inc. v. ITC*, 435 F.3d 1366, 1371 (Fed. Cir. 2006). Moreover, ST's *Nautilus* concern is unfounded. Bars and leads are distinguishable by their function: signal leads carry signal connections to external pins, while the power bar supplies power. A skilled artisan reading the specification would have no difficulty identifying the structures at issue. The "ends" limitation ST proposes would not solve any definiteness problem; it would simply narrow the claim in ST's favor.

The Court should reject ST's proposal and adopt the plain meaning.

### C.      U.S. Patent No. 9,263,299

#### 1.      "temporary carrier"

| Claim Term | Patent/Claims | Plaintiff Chip Packaging's Construction | Defendant ST's Construction |
|---|---|---|---|
| "temporary carrier" (Claims 1, 3, and 4) | '299 Patent, Claims 1, 3, and 4 | Plain and ordinary meaning | "tape" |

U.S. Patent No. 9,263,299 (the "'299 Patent"; Dkt. 42-3) generally relates to improvements in integrated circuit packaging for enhanced thermal performance.

ST seeks to construe "temporary carrier." Chip Packaging submits that this term can be construed to have its plain and ordinary meaning—a structure that carries something temporarily. ST's proposed construction would rewrite the claim term to "tape." While tape is certainly an example of a "temporary carrier," the claims, specification, and file history do not support limiting the claim term to just that one example.

The claims are most instructive. Claim 1 of the '299 Patent recites a step of "mounting a plurality of active device die, into predetermined positions, onto a temporary carrier. . . ." '299 Pat. at 8:11–12. Dependent claim 5 recites that the "temporary carrier" is one of "a carrier tape stretched in a carrier ring apparatus" or "a carrier tape attached to a support plate." That dependent claim adds "tape" as a specific type of temporary carrier. If "temporary carrier" already meant only "tape"—as ST contends—then claim 5's additional limitation that the carrier is a tape would be entirely redundant. The doctrine of claim differentiation strongly presumes that a dependent claim's additional limitation is not already present in the independent claim. *Tandon Corp. v. ITC*, 831 F.2d 1017, 1023 (Fed. Cir. 1987). ST's one-word construction is also inaccurate even as to the embodiments: ST itself describes the Figure 6 embodiment's temporary carrier as the "support plate-backed carrier tape 620"—a tape-plus-support-plate assembly, not "tape." Def. Br. at 20; '299 Pat. at 6:53–61. A construction that misdescribes the disclosed embodiments will not aid the jury.

ST's rewrite of the claim term relies almost entirely on a single passage of the specification. At column 3:45–52, the specification of the '299 Patent describes "another example process" in which "the dies are placed on a temporarily [sic] carrier (tape) in an array (e.g., a matrix) format with fixed pitch in X and Y direction." ST argues that this single parenthetical "***functions like an 'i.e.'***" and therefore serves as a binding definition of "temporary carrier" for the entire patent. Def. Br. at 18 (emphasis added). But the specification passage at issue ***does not*** use "i.e.," and one should not be inferred—especially where, as here, the specification ***does*** use "i.e." in other contexts to actually define a term. *See* '299 Pat. at 3:17–19 ("The present disclosure has been found useful in reducing in a FET device, in the 'On' state, the drain/source electrical resistance (***i.e.***, $R_{Dson}$))." Additionally, the specification regularly uses parentheticals to describe ***examples***, not definitions. *See id*. at 3:33–34 ("In this disclosure the die backside is coated on wafer level with a solderable back side metal (***NiAu, Cu, NiAg, etc.***)"). Therefore, the intrinsic evidence is clear: the phrase "temporary carrier (tape)" discloses "tape" as an example of a "temporary carrier," not as a definition of that term. At a minimum, the single passage does not meet the "exacting" standard

13

required to find that the patentee acted as a lexicographer and defined "temporary carrier" differently than its plain meaning. *See Thorner*, 669 F.3d at 1365 (internal quotation and citation omitted) (explaining that to act as a lexicographer, a patentee "must clearly express an intent to redefine the term"). ST's own authority underscores the gap: *Rembrandt* concerned an express "i.e.," which "is often definitional"; here ST is left to argue that a bare parenthetical "functions like" an "i.e." the patentee never wrote. Def. Br. at 18; *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*, 853 F.3d 1370, 1376 (Fed. Cir. 2017).

ST also argues that "temporary carrier" should be limited to "tape" because the terms are allegedly used interchangeably, such that every disclosed embodiment purportedly uses tape as the "temporary carrier." Def. Br. at 18–20. But the terms are not used interchangeably. To the contrary, the specification repeatedly uses the phrase "temporary carrier" without reference to "tape." '299 Pat. at 1:59–61, 1:65–2:4, 2:22–27. And ST's argument is contrary to established claim construction law. As the Federal Circuit has explained, "[i]t is . . . not enough that the only embodiments, or all of the embodiments, contain a particular limitation," because courts "do not read limitations from the specification into [the] claims" or "redefine words." *Thorner*, 669 F.3d at 1366.

Finally, ST argues that the prosecution history supports its redefinition of "temporary carrier" to "tape." Def. Br. at 19. But the prosecution history reinforces that "temporary carrier" is different than "tape." As ST notes, claim 1 originally referred to a "temporary carrier" with later references to "tape." Dkt. 42-6 at 57. The applicant could have amended claim 1 to replace "temporary carrier" with "tape" throughout—but it did not. Instead, it amended the claims to recite "temporary carrier" throughout. *Id*. at 85. The Examiner approved the claims as presented. *Id*. at 112–113. No amendment narrowed "temporary carrier" to "tape," and the applicant made no statement that could constitute a disavowal—let alone a clear and unmistakable disavowal—of non-tape temporary carriers.

For the foregoing reasons, the Court should reject ST's proposed construction and afford the term "temporary carrier" its plain and ordinary meaning.

14

2.    **"each of said active device die having a solderable conductive surface on its underside"**

| Claim Term | Patent/Claims | Plaintiff Chip Packaging's Construction | Defendant ST's Construction |
|---|---|---|---|
| "each of said active device die having a solderable conductive surface on its underside" (Claims 1, 3, and 4) | '299 Patent, Claims 1, 3, and 4 | No construction necessary | Plain meaning; this describes the packaged active device die |

Claim 1 of the '299 Patent claims a method for "*packaging* an integrated circuit (IC) device," including a step of mounting active device die "having a solderable conductive surface on its underside." The parties dispute whether a method of "packaging" and mounting device die would require the device die to already be "*packaged*," as ST argues. The plain language of the claim dictates that ST's construction is wrong. The limitation "each of said active device die having a solderable conductive surface on its underside" describes a characteristic of the die used as an input to the claimed method—not a characteristic of the die after the method is complete. ST's construction adds the word "packaged," importing a post-process product requirement into a limitation that describes a pre-process input. Indeed, the limitation sits inside the "mounting" step itself: claim 1 recites "mounting a plurality of active device die, into predetermined positions, onto a temporary carrier, each said active device die having bond pads, each of said active device die having a solderable conductive surface on its underside." '299 Pat. at cl. 1. Grammatically, the "having" clauses describe the die as they are mounted—at the front end of the claimed process, not at its conclusion. It should be rejected, and the Court should afford this phrase its plain and ordinary meaning.

ST's arguments to the contrary should be rejected. First, ST contends that the title and Summary of the Invention section of the patent dictate that the final packaged product must have an exposed, solderable surface. Def. Br. at 21–22 (citing '299 Pat. at Title, 1:40–55). But even if that were true, it does not somehow limit the method of "packaging" to a particular condition that

15

exists after packaging. The structure of the claims confirms the point. Claim 1 ends with the reflow step; it is dependent claim 4 that adds "encapsulating . . . in a molding compound," "removing the temporary carrier," and "singulating . . . into individual devices." '299 Pat. at cls. 1, 4. Asserted claims 1 and 3 thus stop short of any completed package at all. A construction that makes the mounting step turn on the configuration of a finished "packaged" device that claims 1 and 3 never require cannot be correct.

ST's citations to other portions of the specification (Def. Br. at 22) are similarly misplaced. For instance, at '299 Pat. at 3:34–38, the specification explains that "[a]ny solderable finish can be used, as long as the solderability is not deteriorated by the processing conditions and allows storage for a sufficient period between package assembly and customer use." ST reads this as requiring the solderable surface to remain present and exposed in the finished package. But the passage merely describes criteria for material selection: it tells the skilled artisan which solderable finishes are acceptable inputs to the claimed method—those that withstand the assembly process and retain solderability through the storage period before customer use. The passage says nothing about whether the die's underside must be externally exposed in the finished package versus consumed in an internal solder joint during assembly. It is an engineering specification for the input material, not a definition of the finished package configuration.

Nor does the prosecution history compel ST's construction. Def. Br. at 22–23. The Examiner distinguished a prior art reference, Kelkar, because it did not "disclose the die having a solderable conductive surface on its underside." Dkt. 42-6 at 114. This statement confirms that the claim requires the die to have a solderable surface—not that the resulting package must have a particular configuration.

Finally, contrary to ST's argument (Def. Br. at 23), Chip Packaging's construction does not exclude any disclosed embodiment. The exposed-die packages shown in the '299 Patent satisfy the element under Chip Packaging's construction because those packages use die with solderable undersides as inputs, and the resulting packages expose those surfaces. ST's citation to *Vitronics* is misplaced: *Vitronics* bars constructions that **exclude** the disclosed embodiments; it does not

16

prohibit broader constructions. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). The Court should reject ST's proposed construction.

### 3.    "mounting . . . dispensing . . . attaching . . . and reflowing . . ."

| Claim Term | Patent/Claims | Plaintiff Chip Packaging's Construction | Defendant ST's Construction |
|---|---|---|---|
| "mounting . . . dispensing . . . attaching . . . and reflowing . . ." (Claims 1, 3, and 4) | '299 Patent, Claims 1, 3, and 4 | No construction necessary | "(1) mounting . . . (2) dispensing . . . (3) attaching . . . and (4) reflowing" (The claimed method requires the recited steps to be performed in the order stated) |

The Federal Circuit's two-part *Altiris* test governs step ordering in method claims. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369–70 (Fed. Cir. 2003). A strict sequential order is required only if: (1) the claim language requires it as a matter of logic or grammar, or (2) the specification or prosecution history make clear that order is required. *Id*. Neither condition is satisfied here.

Under the first part of the *Altiris* test, the claim language does not require all four steps to be performed strictly in the listed order, without overlap, as a matter of logic or grammar. ST correctly notes that two specific phrases in the attaching step acknowledge temporal relationships. Def. Br. at 24. The requirement that the lead frame have device positions "which correspond to the predetermined positions of the plurality of active device die" ('299 Pat. at cl. 1) confirms that the die must already be mounted—and thus occupy their predetermined positions—before the lead frame is attached. The requirement that "upper lead frame portions contact the solder paste present on the bond pads" (*id.*) confirms that solder paste must already be present on the bond pads before the lead frame is attached. Chip Packaging does not dispute either dependency. But those phrases do not establish that all four steps must be performed in strict sequence with no overlap, or that attaching must be fully complete before any reflowing can begin. Stripped of the dependencies the

17

claim itself supplies, the only ordering ST's construction would actually add is a requirement that the mounting step be completed before any solder paste is dispensed. Nothing in the claim's logic or grammar requires that: solder paste may be applied to the bond pads of the die before, during, or after the die are mounted onto the temporary carrier, and the claim reads on each alternative. ST identifies no claim language to the contrary.

The specification does not compel a different result under the second part of the *Altiris* test. ST points to 3:53–60, where the specification uses sequential "Next" language to describe dispensing solder paste onto the exposed bond pads and then placing the lead frame over the deposited paste. Def. Br. at 25. ST also cites Figure 5, which depicts the process steps as a flowchart in which each step follows the prior. But describing manufacturing steps sequentially in an embodiment—the standard format for any process patent—does not transform every step into a strict claim limitation. The Federal Circuit has held that a specification's sequential description of preferred embodiment steps does not, by itself, require those steps to be performed in that order, without overlap, as a claim limitation. *Altiris*, 318 F.3d at 1370. "Next" is the natural language of process disclosure, not a signal of claim restriction. Under ST's logic, virtually every process patent that uses ordinary sequential narration to describe its preferred embodiment would impose a strict no-overlap requirement on its claims—a result directly at odds with the principle that embodiments do not limit claim scope.

Finally, contrary to ST's argument, the prosecution history does not compel ST's requested result. Def. Br. at 25–26. During prosecution, the Examiner distinguished the prior art Gong reference because "Gong first mounts the die into positions on the lead frame" in a manner that does not involve a temporary carrier. Dkt. 42-6 at 114. The applicant responded by emphasizing that the claimed method uses a temporary carrier to mount the die before dispensing solder paste. *Id*. The prosecution history's discussion of the Kelkar reference is similarly limited in scope. The Examiner distinguished Kelkar because Kelkar dispensed solder material through an opening in a lead frame that was already attached—meaning Kelkar dispensed after and through the already-placed lead frame, not onto exposed die bond pads before lead frame attachment. *Id*. at 113–14.

18

The Examiner's concern was not about step sequencing broadly; it was about whether Kelkar disclosed the claimed dispensing step at all: dispensing solder paste onto exposed bond pads of die mounted on a temporary carrier, before the lead frame is placed. That distinction is about what is dispensed, where, and in relation to which structure—not about whether all four claimed steps must proceed to completion before the next begins.

The Gong and Kelkar prosecution history exchanges were narrow prior-art distinctions— about the use of a temporary carrier and the manner of solder deposition—not clear and unmistakable disclaimers of all methods in which any two steps proceed with overlap. Indeed, the statements at issue were not even made by the applicant, but rather by the patent Examiner. Courts have consistently refused to import requirements from prosecution history statements that are not clear and unmistakable disclaimers made by the patent applicant. ST's own cited authority holds precisely that. *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1345–47 (Fed. Cir. 2005); *see also 3M Innovative Props. Co.*, 725 F.3d at 1326.

### D.    U.S. Patent No. 8,643,189

#### 1.    "power rail pad"

| Claim Term | Patent/Claims | Plaintiff Chip Packaging's Construction | Defendant ST's Construction |
|---|---|---|---|
| "power rail pad" (Claims 1, 13, 14, and 19) | '189 Patent, Claims 1, 13, 14, and 19 | "A conductive pad on the die connection pad surface" | "A conductive pad not integrated with the die circuitry that supplies power to circuit nodes of the die." |

U.S. Patent No. 8,643,189 (the "'189 Patent"; Dkt. 42-4) generally relates to semiconductor packaging structures and methods for improved power connectivity.

Both parties agree that the "power rail pad" is a "conductive pad." The Court should adopt Chip Packaging's proposed construction—"a conductive pad on the die connection pad surface"— because, unlike ST's proposed construction, it is consistent with the claims, specification, and

19

prosecution history. Claim 1 explains that the "power rail pad" exists "on the die connection pad surface." '189 Pat., 7:36–37. The specification likewise explains that the "power rail pads" are "mounted on the die connection pad surface 303 by an epoxy or other form of adhesive." *Id*. at 4:13–16. During prosecution, the applicant likewise described that the "power rail pad" is "electrically connected to the die connection pads 304 with bond wires 501" and that the "power rail pads" are "mounted on the die surface and attached thereto with an adhesive." Dkt. 42-7 at 77. Chip Packaging's construction is consistent with these disclosures.

ST's proposed construction should be rejected for several reasons. First, ST's construction violates the doctrine of claim differentiation, which presumes that each claim differs in scope. *See Tandon*, 831 F.2d at 1023. Claim 11 of the '189 Patent expressly limits "the power rail pad" to "a non-circuit node." That dependent limitation would be entirely superfluous under ST's proposed construction. If independent claim 1 already required a power rail pad to be "not integrated with the die circuitry" (as ST proposes), claim 11's additional qualifier that the "power rail pad" be a "non-circuit node" would add nothing. Such a construction is almost never correct. The claim set as a whole confirms the point: independent claim 15 and dependent claims 11 and 20 each expressly recite that "the power rail pad is a non-circuit node of the semiconductor die," while asserted independent claims 1 and 19 contain no such language. The patentee knew exactly how to claim the "non-circuit node" characteristic when it wanted to—and chose not to in the asserted independent claims. ST's riposte—that claim differentiation cannot override lexicography or disavowal (Def. Br. at 28 n.6)—assumes its conclusion: as shown below, there is neither.

Second, ST's proposed construction is misleading—it distorts the disclosures of the specification and the arguments made during prosecution, and it would likely cause juror confusion if adopted. ST relies heavily on the specification's description, at '189 Pat. 4:27–31, that the power rail pads are "non-circuit nodes of the semiconductor die" and "are not integrated nodes of the circuitry within the semiconductor die." Def. Br. at 26–28. But ST's construction does not use those words; instead, its proposed construction imprecisely defines the "power rail pad" as "not integrated ***with*** die circuitry." That imprecision will very likely lead to juror confusion, because

"not integrated with" die circuitry could lead jurors to believe that the "power rail pad" has no connection whatsoever with the die circuitry.

That interpretation of "power rail pad" would be inconsistent with the intrinsic record. During prosecution, the inventors explained that a prior art reference (Jassowski) did not disclose the claimed "power rail pads" because the power rails of Jassowski "are located *inside the die* and are formed during die fabrication." Dkt. 42-7 at 77 (emphasis added). By contrast, the "power rail pads" of the claimed invention exist "*on the top surface* of the die." *Id*. But, as the applicants further explained, although the claimed "power rail pads" exist on the top surface of the die, they are still "*electrically connected* to the die connection pads" with bond wires. *Id*. Thus, in describing that the claimed power rail pads are "not integrated nodes of the circuitry within the semiconductor die" and "non-circuit nodes," the inventors were merely clarifying that the claimed "power rail pads" do not exist *inside* the die.

ST's proposed construction (specifically, the language "not integrated with the die circuitry") is therefore confusing—and wrong—because it could improperly leave jurors with the impression that the "power rail pads" have no connection whatsoever with the die circuitry. As the specification and file history makes clear, the "power rail pads" are, in fact, still electrically connected to the die circuitry. Dkt. 42-7 at 77 ("[T]he power rail pad 309 or 310 is electrically connected to the die connection pads 304 with bond wires 501."). Nor is any of this lexicography: unlike in *Sinorgchem*, where the specification set the defined term off in quotation marks and supplied an express definition, the sentences ST quotes merely describe the depicted embodiment—"the power rail pads 309, 310"—by figure numeral. *Sinorgchem Co., Shandong v. ITC*, 511 F.3d 1132, 1136 (Fed. Cir. 2007). Embodiment description is not redefinition. *Thorner*, 669 F.3d at 1365–66. Chip Packaging's proposed construction—"a conductive pad on the die connection pad surface"—is faithful to the intrinsic record. It reflects the structural characteristic that consistently defines a power rail pad throughout the specification: it is a pad located on the die's surface (the die connection pad surface), as opposed to an internal die circuit element. This construction captures the key distinction drawn in prosecution without importing limitations that

21

appear nowhere in the claim language and that would render claim 11 superfluous. The Court should adopt Chip Packaging's construction.

### 2.    "opposite die connection pad surface"

| Claim Term | Patent/Claims | Plaintiff Chip Packaging's Construction | Defendant ST's Construction |
|---|---|---|---|
| "opposite die connection pad surface" (Claims 1, 15, and 19) | '189 Patent, Claims 1, 15, and 19 | No construction necessary | "the top active surface of the die (opposite to the mounting surface)" |

Independent claims 1, 15, and 19 of the '189 Patent recite structures and methods for semiconductor packaging that include a "die support mounting surface" and an "opposite die connection pad surface with associated die connection pads." The claim language itself already makes clear that the "die connection pad surface" is opposite to—*i.e.*, on the other side of—the "mounting surface." Chip Packaging submits that this concept is readily understandable, and that no further construction is necessary.

ST's proposed construction should be rejected at least because it imposes an absolute directional constraint—the word "top"—where no such constraint exists in the claim. Whether a surface is physically "top" depends on orientation, which may vary across package configurations, or even just one's perspective. The operative structural relationship of the claim is "opposite" to the mounting surface. ST's construction also inserts the word "active"—a technical characterization of the surface that likewise appears nowhere in the claims. The claims require only die connection pads (circuit nodes) on the surface opposite the mounting surface; whether that surface is also the die's "active" surface is an extraneous limitation that invites needless dispute at trial.

ST relies on a single statement in the prosecution history where the applicant described the opposite die connection pad surface as the "(top, active surface)." Dkt. 42-7 at 75. But that one statement was made to describe a particular embodiment—it was not made to distinguish prior art, let alone as a definitional statement that "opposite die connection pad surface" means "top" in all

configurations. It does not remotely constitute the sort of clear and unmistakable statement required to limit a claim's scope based on prosecution history. *See 3M*, 725 F.3d at 1326.

## V.   CONCLUSION

For the foregoing reasons, Plaintiff Chip Packaging Technologies, LLC respectfully requests that the Court adopt its proposals for each of the nine disputed claim terms, enter the parties' agreed constructions for the two agreed terms, and reject Defendant ST's proposed constructions in their entirety.

Dated: July 21, 2026

 Respectfully submitted,

*/s/ Ameet Modi*
Garland Stephens (Texas Bar No. 24053910)
garland@bluepeak.law
Robert Magee (*pro hac vice*)
robert@bluepeak.law
Justin Constant (*pro hac vice*)
justin@bluepeak.law
Richard Koehl (Texas Bar No. 24115754)
richard@bluepeak.law
Kate Falkenstien (*pro hac vice*)
kate@bluepeak.law
Heng Gong (New York Bar No. 4930509)
heng@bluepeak.law
Natalie Lieber (*pro hac vice*)
lieber@bluepeak.law
Ameet Modi (*pro hac vice*)
modi@bluepeak.law
**BLUE PEAK LAW GROUP LLP**
3139 West Holcombe Blvd.
PMB 8160
Houston, TX 77025
Telephone: (281) 972-3036

*Of Counsel:*
Mark D. Siegmund (Texas Bar No. 24117055)
msiegmund@cjsjlaw.com
**CHERRY JOHNSON SIEGMUND JAMES, PC**
7901 Fish Pond Road, 2nd Floor
Waco, TX 76710
Telephone: (254) 732-2242
Fax: (866) 627-3509

William D. Ellerman (Texas Bar No. 24007151)
wellerman@cjsjlaw.com
**CHERRY JOHNSON SIEGMUND JAMES, PC**
One Glen Lakes Tower
8140 Walnut Hill Lane, Suite 105
Dallas, TX 75231
Telephone: (254) 732-2242
Fax: (866) 627-3509

ATTORNEYS FOR PLAINTIFF CHIP
PACKAGING TECHNOLOGIES, LLC

24

25

## <u>CERTIFICATE OF SERVICE</u>

A true and correct copy of Plaintiff Chip Packaging Technologies, LLC's Responsive Claim Construction Brief was served via CM/ECF to all counsel of record on July 21, 2026.

*/s/ Ameet Modi*
Ameet Modi

25