**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | |
|---|---|
| CHIP PACKAGING TECHNOLOGIES, LLC, | |
| Plaintiff, | Civil Action No. 7:25-cv-00505-DC-DTG |
| v. | JURY TRIAL DEMANDED |
| STMICROELECTRONICS, INC., | |
| Defendant. | |

**<u>DEFENDANT STMICROELECTRONICS, INC.'S REPLY CLAIM CONSTRUCTION BRIEF</u>**

517887713.4

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................................. 1

II.     DISPUTED TERMS ............................................................................................................ 1

    A.      U.S. PATENT 9,685,351 ........................................................................................... 1

        1.      "positive mold lock structure" (Claims 1-3) ................................................. 1

        2.      "laterally protrude above the top surface" (Claims 1-3) ............................... 4

    B.      U.S. PATENT 9,299,646 ........................................................................................... 6

        1.      "said area" (Claims 1, 5-7, 11) ....................................................................... 6

        2.      "disposed between [the embedded portions of] the plurality of signal leads and the first side of the power bar" (Claims 1, 5-7, 11) ................................. 6

    C.      U.S. PATENT 9,263,299 ........................................................................................... 7

        1.      "temporary carrier" (Claims 1, 3, and 4) ....................................................... 7

        2.      "each of said active device die having a solderable conductive surface on its underside" (Claims 1, 3, and 4) ..................................................................... 10

        3.      "mounting . . . dispensing . . . attaching . . . and reflowing . . ." (Claims 1, 3, and 4) ............................................................................................................. 12

    D.      U.S. PATENT 8,643,189 ......................................................................................... 13

        1.      "power rail pad" (Claims 1, 13, 14, and 19) ................................................ 13

        2.      "opposite die connection pad surface" (Claims 1, 13, 14, and 19) .............. 15

III.    CONCLUSION .................................................................................................................. 15

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*AstraZeneca AB v. Mut. Pharm. Co.*,
    384 F.3d 1333 (Fed. Cir. 2004)..............................................................................................14

*Aventis Pharma S.A. v. Hospira, Inc.*,
    675 F.3d 1324 (Fed. Cir. 2012).............................................................................................2, 9

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*,
    262 F.3d 1258 (Fed. Cir. 2001)..................................................................................................9

*Bicon, Inc. v. Straumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006)....................................................................................................4

*Edwards Lifesciences LLC v. Cook Inc.*,
    582 F.3d 1322 (Fed. Cir. 2009).............................................................................................9, 10

*Fenner Invs., Ltd. v. Cellco P'ship*,
    778 F.3d 1320 (Fed. Cir. 2015).............................................................................................8, 15

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
    452 F.3d 1312 (Fed. Cir. 2006)............................................................................................10, 11

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
    No. 2:17-cv-577-JRG, ECF No. 197 (E.D. Tex. Nov. 6, 2018) ................................................6

*Luminara Worldwide, LLC v. Liown Elecs. Co. Ltd.*,
    814 F.3d 1343 (Fed. Cir. 2016)................................................................................................15

*MyPAQ Holdings Ltd. v. Samsung Elecs. Co.*,
    No. 2023-2024, 2025 WL 1189920 (Fed. Cir. Apr. 24, 2025) ................................................9

*Salazar v. Procter & Gamble Co.*,
    414 F.3d 1342 (Fed. Cir. 2005)...............................................................................................8, 13

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001)...............................................................................................2, 3

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
    511 F.3d 1132 (Fed. Cir. 2007)................................................................................................14

*SkinMedica, Inc. v. Histogen Inc.*,
    727 F.3d 1187 (Fed. Cir. 2013)..................................................................................................9

*Thorner v. Sony Computer Ent. Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012).................................................................................................2

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007).............................................................................................11

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996)..................................................................................................5

## I.    INTRODUCTION

CPT describes ST's proposed constructions as having a "consistent" "pattern" that "systematically seek to narrow or rewrite clear claim language," but the facts tell a different story. ST's approach is measured and consistent with Federal Circuit precedent. For four of nine disputed terms, ST proposes the plain and ordinary meaning, while CPT defends a meaning inconsistent with that meaning (two terms) or all but concedes ST's meaning is correct while seeking to shield that meaning from the jury (the other two terms). For the remaining five, ST proposes the constructions demanded by limiting statements and definitions in the intrinsic record. That is not the overreach CPT portrays. It is the correct application of the law to the facts. ST does not ask the Court to import limitations. ST asks the Court to hold the patentees to the definitions, disclaimers, and disavowals the intrinsic record demands. The Court should adopt ST's proposals.

## II.    DISPUTED TERMS

### A.    U.S. PATENT 9,685,351

#### 1.    "positive mold lock structure" (Claims 1-3)

The parties agree that "positive mold lock structure" refers, at least partially, to "raised mechanical locking features." The sole dispute is whether the construction must include the patentee's own repeated disclaimer of conventional etched, stamped, and recessed features. ST submits that it must. CPT's partial adoption of the specification's language while disowning the specification's disclaimers would allow the patentee to claw back scope that was repeatedly distinguished from being within the meaning of a "positive mold lock structure."[1]

---

[1] On July 23, 2026, CPT sought a one-month extension—from August 8 to September 8, 2026—of its deadline to respond to the June 8, 2026 non-final Office Action rejecting all reexamined claims of the '351 Patent, stating that it is "evaluating the Office Action in view of the district court litigation" and "weighing the option of submitting supplemental evidence, such as a declaration from an expert in the relevant technology, to fully respond to the Office Action." Ex. N at 1. The Patent Office granted CPT's extension on July 27, 2026. Ex. O. CPT's response is thus now due after the

CPT's brief relies on *Thorner* to suggest that ST's construction is "read[ing] limitations from the specification into claims," but CPT does not dispute that "positive mold lock" is a coined term whose meaning derives from the specification. Resp. Br. at 4-6 (citing *Thorner* four times and arguing that ST's "observation that the term is 'coined' changes nothing"). ST's construction does not read in limitations. It recognizes the repeated disclaimers that the patentee used to attribute meaning to the term. Op. Br. at 2-5. *Thorner* states that "[w]here the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent." *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001)).

The same principle applies here. The specification repeatedly and expressly contrasts the disclosed embodiments with conventional approaches using the parenthetical exclusion—"raised (*not etched, stamped, or recessed*)" mechanical locking features. Ex. A at 3:37–47; 5:61–6:4; 6:25–32. These passages are not mere examples; they are definitional and controlling. *See Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) ("This clear expression need not be *in haec verba* but may be inferred from clear limiting descriptions of the invention in the specification or prosecution history."). That the patentee distinguished its allegedly novel embodiments from "conventional approaches which use etched, stamped, or recessed features" only provides further reason to find disavowal of structures having these features. Ex. A at 5:7–14. CPT contends that this passage concerns only a "single embodiment," but the same parenthetical (not etched, stamped, or recessed) describes both wedge bond loops 114 and stud bumps 214-215—making the conventional

---

September 1, 2026 Markman hearing and may add intrinsic evidence bearing on the terms construed here, reinforcing the grounds for ST's pending motion to stay. ECF Nos. 39, 41.

approach distinction equally applicable to both. Op. Br. at 5. These patentee statements "distinguish the prior art" and "point out the advantages" of the allegedly inventive positive mold lock structures, and thus "the claims should not be read so broadly as to encompass the distinguished prior art structure." *SciMed*, 242 F.3d at 1343; *see* Resp. Br. at 6 (conceding the patent's "contrast[] with conventional prior-art approaches" is "an explanation of the invention's advantages"). CPT's silence on the controlling caselaw is telling.

CPT's remaining arguments are unpersuasive. CPT argues that the three specification parentheticals—"(not etched, stamped, or recessed)" (twice) and "(not half-etched)" (once)—are inconsistent. Resp. Br. at 6. That argument misreads the evidence. "Half-etched" is a specific subtype of "etched." These exclusionary parentheticals are not inconsistent—they consistently exclude subtractive processes. If anything, the "not half-etched" limitation is a further exclusion over and above "not etched, stamped, or recessed"—it is certainly no indicator that the patentee intended to reclaim the carefully distinguished prior art approaches described earlier with respect to wedge bond loops 114 and stud bumps 214-215. These passages, read together, establish a single, consistent meaning: "positive" mold lock structures was coined to refer to raised structures and not to etched, stamped, or recessed, or even half-etched structures.

CPT argues the prosecution history supports CPT because applicant only mentioned protruding and locking with mold—and did not repeat that the structures are not etched, stamped, or recessed. Resp. Br. at 5. ST's opening brief cited that statement as evidence that the term is coined, a point which CPT all but concedes. *Id.* The mere fact that this passage did not double-down on the specification disavowals does not undermine those statements. Patentee's argument was focused on distinguishing raised structures the patentee argued served no mold lock function; the patentee had no reason to re-raise the not etched, stamped, or recessed distinction at that time.

CPT's proposed construction that "positive" just means "raised" adds nothing beyond the already recited requirement "laterally protrude *above the top surface.*" To give the term independent meaning, "positive" must do more work—it must distinguish raised features from subtractive ones. *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("claims are interpreted with an eye toward giving effect to all terms in the claim.").

Finally, CPT casts ST's discussion of dam bar 108 as manufacturing a "non-infringement" argument and as one about an element not found within the intrinsic record. That position is, however, puzzling because dam bar 108 is described by the '351 Patent (i.e., it is part of the intrinsic record) but not as a positive mold lock structure. ST's point is that CPT's proposed construction covers such previously well-known structures—a point CPT's response appears to concede. The Court should adopt ST's construction.

### 2. "laterally protrude above the top surface" (Claims 1-3)

The parties agree this term has its plain and ordinary meaning but dispute what meaning the term "laterally" imparts to the claim. Resp. Br. at 7. The parties appear to agree that "above the top surface" describes the location of a protrusion relative to the top surface of the lead frame. Although CPT casts the dispute as a dispute over the parties' choice of words ("along" versus "to the side of"), the real dispute is whether the term "laterally protrudes" describes the *direction* of the protrusion (ST's construction) or concerns a second, undisclosed *location* requirement (CPT's construction).

ST's proposal correctly addresses that laterally protrude describes a *direction* and elegantly provides an easy-to-comprehend reference frame for that direction: the positive mold lock structure must protrude "*along . . . the top surface*" (that is, in a direction horizontal to the surface). CPT concedes that the term refers to a "structure that extends laterally—to the side—*from its base* while elevated above that surface. . ." Resp. Br. at 8. This confirms the unstated reference in the claim— the mold lock structure must protrude *laterally from its base*, that is sideways with respect to the

mold lock structure or horizontally along the top surface. The real issue is not whether the term "to the side" or "along" is used in the construction, it is which construction correctly identifies and captures a proper frame of directional reference for the term "laterally protrude." ST captures this meaning precisely and consistently with all embodiments. Op. Br. at 8 (collecting cites).

CPT's proposal does not clarify direction at all. It adds a second, unsupported *location* requirement: "*to the side of* and above *the top surface*." Resp. Br. at 7. That construction improperly uses the top surface as a reference for location and would place the protrusion spatially offset *to the side of* it—a location beyond the edge of the lead frame. CPT converts the directional concept of the claim and specification into a locational one, placing the protrusion in a location that no disclosed embodiment shows. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). Wire loops (Figs. 4-7) and stud bumps (Figs. 8-9) all protrude above and along the top surface (consistent with ST's construction), not to its side (inconsistent with CPT's construction). CPT's proposal also conflicts with the specification's description that mold compound "flow[s] under" the laterally protruding features for "secure locking"—for this to work, the protrusion must be along and above the surface, not offset to its side. Ex. A at 4:26–29; 5:59–61.

CPT's criticisms of ST's proposal are without merit. CPT argues *Hologic* is inapplicable because the claim provides its own reference ("the top surface"). But resolving the ambiguity in the frame of reference is the point of ST's construction and the key distinction in the parties' competing constructions. ST properly recognizes that the protrusion is in the sideways direction with respect to the structure itself (equivalently stated as along the surface), while CPT contends the reference is the lead frame (incorrectly suggesting a protrusion located to its side). CPT's proposal would mislead the jury into believing the protrusion must be located to the side of the lead frame rather than

extending horizontally above it.[2] The Court should adopt ST's construction.

### B.    U.S. PATENT 9,299,646

#### 1.    "said area" (Claims 1, 5-7, 11)

The parties agree on the antecedent basis and plain meaning for this term. ST's construction simply makes this meaning explicit for the jury (which courts routinely do[3]), while CPT wants to hide the meaning from the jury. ST submits that the jury would benefit from the clarified antecedent basis. *See* Op. Br. at 13-14. The Court should adopt ST's construction.

#### 2.    "disposed between [the embedded portions of] the plurality of signal leads and the first side of the power bar" (Claims 1, 5-7, 11)

ST's construction clarifies the term based on the plain and ordinary meaning of "between" that CPT concedes: "between" refers to "*in the space or interval separating.*" Resp. Br. at 10. Being disposed in "*space or interval separating*" the signal leads and the first side of the power bar requires that the first portion of the ground bar be disposed between the *ends* of the signal leads and the first side of the power bar. This is precisely the space or interval defining the separation between those two things. CPT attacks ST's construction as "rewriting" the claim but never advances an alternative plain meaning showing ST's proposal to be incorrect—CPT instead tries to hide its non-plain meaning under the guise of an "infringement" dispute. Resp. Br. at 10-12. CPT's brief sidesteps the real dispute—CPT's interpretation would extend the meaning of "between" to include the area *amongst* the signal leads. *See* Op. Br. at 14-15. Under any reasonable interpretation, the area "amongst" the signal leads is *not between* the signal leads and first side of the power bar.

CPT's criticisms of ST's proposed construction fail. First, CPT attempts to obscure the

---

[2] CPT's proposed construction (and location requirement) also covers the dam bar 108—which the intrinsic record never refers to as a mold lock structure but is instead an entirely separate and well-known feature.

[3] *See, e.g.*, *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, No. 2:17-cv-577-JRG, ECF No. 197 at 40-41 (E.D. Tex. Nov. 6, 2018).

specification, suggesting that the location of the ends 122a of signal leads 122 and power bar 124 is somehow not relevant to the question. Resp. Br. at 11. But Figure 2 clearly shows that ground bar portion 132a is located in area 127, *between* the ends 122a of signal leads 122 and the first side 124a of power bar 124.[4] Figure 2 is the only embodiment, and it only supports ST's construction.

Second, CPT argues ST's *Nautilus* concern "is not a proper claim construction argument; it is an invalidity defense." Resp. Br. at 12. ST is not arguing the claim is indefinite under its plain meaning. Instead, ST argues that the claim is indefinite *under CPT's improper, non-plain meaning*. CPT tries to defend the claim's validity by suggesting that bars and leads are "distinguishable by their function: signal leads carry signal connections to external pins, while the power bar supplies power." Resp. Br. at 12. This argument misses the point. ST's alternative indefiniteness argument is not about distinguishing a signal lead from a power bar—it is concerned with the inability to distinguish a power bar from a power lead and a ground bar from a ground lead under CPT's interpretation. CPT does not deny that the specification provides no material, geometric, or compositional standard for distinguishing a bar from a lead of the same type. Ex. B at 3:16-18; 3:43-45. Far from disproving ST's indefiniteness concern, CPT confirms it. The Court should adopt ST's construction and expressly reject CPT's implied reading that "between" may encompass "among."

### C. U.S. PATENT 9,263,299

#### 1. "temporary carrier" (Claims 1, 3, and 4)

The parties dispute whether "temporary carrier" should be given its plain and ordinary meaning, or whether the patentee's lexicography governs. ST submits that the intrinsic record makes

---

[4] CPT's brief argues in a footnote that the specification's typographical error sometimes referring to embedded ends 122a as embedded ends 122b is "internally consistent" and cannot support ST's construction. ST submits that the references to embedded ends 122b in the specification are readily understood typographical errors. To the extent CPT is correct, however, it only adds to the indefiniteness issues that persist if the claim is interpreted as CPT suggests.

clear that the term means "tape," and is not just anything that carries something temporarily. CPT's arguments to the contrary ring hollow. CPT first argues that claim differentiation demands the claimed "temporary carrier" be something more than just tape, pointing to Claim 5. But Claim 5 recites two specific kinds of "tape"—carrier tape stretched in a carrier ring apparatus and carrier tape attached to a support plate. There is no claim differentiation issue here. Even if there were, claim differentiation cannot broaden the claim term beyond its meaning in light of the specification. *Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1327 (Fed. Cir. 2015). CPT also points at an alleged inconsistency with Figure 6, but that argument is also easily dispatched—"plate-backed carrier tape 620" is just a specific kind of "tape" and is embraced by ST's proposal.

CPT tries to explain away the prosecution history by suggesting that the applicant could have amended the claim "to replace 'temporary carrier' with 'tape' throughout." Resp. Br. at 14. But ST's point is that the *original* claim as submitted with the *originally filed* application treated the two terms interchangeably—code switching from "temporary carrier" to "tape" half-way through the claim. This is strong evidence that the patentee viewed the two terms as interchangeable, further supported by the Examiner's similar treatment of the terms. Ex. F at 113; *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005). The prosecution history supports ST's construction.

CPT spends considerable attention arguing that the specification statement that "the dies are placed on a *temporarily [sic] carrier (tape)* in an array (e.g., a matrix) format" is not definitional. Ex. C at 3:49–52. CPT argues that other passages use "i.e." parenthetically to define a term—"(i.e., $R_{DSon}$)"—and use parentheticals without "e.g." to describe examples—"(*NiAu, Cu, NiAg, etc.*)." Resp. Br. at 13 (citing 3:17-19; 3:33-34). But CPT ignores that the specification also uses parentheticals without an "i.e." to define terms—Chromium is defined as (Cr), Titanium is defined as (Ti). 3:38-41. And these definitions are provided in the paragraph immediately preceding the one

517887713.4 8

at issue. 3:45-52. That the specification uses parentheticals in multiple ways counsels in favor of examining the context of the specific usage in question. *See MyPAQ Holdings Ltd. v. Samsung Elecs. Co.*, No. 2023-2024, 2025 WL 1189920, at *3 (Fed. Cir. Apr. 24, 2025) ("placing a quoted word or term inside parentheses is a conventional manner by which one may define another term used in a document . . . and we have found such formulations may be indicative of lexicography in a patent"). Here, there is no "etc." indicating examples and there is only one term provided—tape—indicative of a definition. More telling, (tape) appears in the *same sentence* as a parenthetical (e.g. a matrix) used to identify an example. All the context clues support that the parenthetical (tape) is definitional. *Aventis*, 675 F.3d at 1330 ("This clear expression need not be *in haec verba* but may be inferred from clear limiting descriptions of the invention. . .").

CPT argues that the absence of "i.e." is dispositive, but the Federal Circuit has never required a magic word or phrase to find that the applicant redefined a term. *See id.* Whether the Court views '(tape)' as definitional or as one piece of a broader pattern of consistent interchangeable usage, the result is the same. *See SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1195–96, 1200 (Fed. Cir. 2013). What matters is whether the intrinsic record as a whole reveals a "clear expression" of the patentee's intent to define the term.  Here, the pattern is consistent: (a) the original claims used "temporary carrier" and "carrier tape" interchangeably; (b) every embodiment is tape; (c) the Examiner echoed the parenthetical; (d) no non-tape carrier is disclosed. Ex. C at 4:7–18; 6:1–5; 6:53–61. Even if "(tape)" is not a formal "i.e.," the intrinsic record establishes definition by implication. *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001).

CPT's proposed plain meaning — "a structure that carries something temporarily" — should be rejected. The patent is directed to manufacturing an exposed die package and the "temporary

517887713.4                                                9

carrier" must, at a minimum, have a releasable adhesive quality to make the exposed die package. Ex. C at 1:49–54; 3:34–44. The claims themselves suggest this temporary adhesive quality— requiring "mounting" the active device die and "attaching" a lead frame to it (Claim 1), and after encapsulation "removing" it (Claim 4). The adhesive quality of the temporary carrier is what preserves the conductive surface of the die in encapsulation and whose removal exposes that surface. Ex. C at 4:7–18; 6:20–29; Fig. 5 (step 545); 5:20-35; *see* Ex. I (REVALPHA article).

At bottom, CPT can point to no example of any embodiment in the claims or specification where the claimed "temporary carrier" is anything other than "tape." Where the specification uses a term consistently in only one way and discloses no broader alternative, that usage supplies the term's meaning. *Edwards*, 582 F.3d at 1329; *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006). CPT's "plain meaning" should be rejected, and ST's proposal should be adopted.

### 2. "each of said active device die having a solderable conductive surface on its underside" (Claims 1, 3, and 4)

The parties appear to agree that the plain meaning of this phrase requires each of the active device die to have a solderable conductive surface on its underside. The parties' dispute centers on whether that characteristic must be preserved through the packaging process (ST's position), or whether the underside conductive surface may be consumed or buried during packaging such that the die's underside conductive surface is no longer exposed once packaged (CPT's position).

CPT argues that the underside conductive surface is a mere characteristic of the active device die that must exist at mounting and no more. The question is not *whether* the die must have a solderable underside at the time the mounting step is performed—both parties agree it must. The question is whether the claim can be satisfied by a method that *destroys* that characteristic during packaging, such that the packaged device no longer has a solderable conductive underside. ST submits that it cannot. Under *Verizon*, "[w]hen a patent thus describes the features of the 'present

invention' as a whole, this description limits the scope of the invention." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007); *see also Honeywell Int'l,* 452 F.3d at 1318. Here, the entire point of the claimed invention is a process for manufacturing an exposed die package. The title of the patent is "Exposed Die Clip Bond Power Package," and the "*present disclosure* addresses the challenge of making a semiconductor power package with minimal $R_{DSon}$," which "*is obtained by having the backside of the die exposed in the package*." Ex. C, Title, 1:46-50; *see* 1:5-10 (disclosure directed to "*an exposed underside surface* providing enhanced thermal performance"). The specification repeatedly confirms that the disclosed process preserves the underside conductive die surface so that it is exposed in the packaged device. *Id.* at 2:10-25; 3:33-38; 5:28-34; 5:61-67. CPT ignores the controlling *Verizon* caselaw cited in ST's opening brief.

Yet *Verizon* is directly analogous. The asserted method claims there recited registering a wireless telephone terminal in a "localized wireless gateway system"—saying nothing about compression or packetization. *Verizon*, 503 F.3d at 1299-1300. The Federal Circuit nevertheless limited the claimed "localized wireless gateway system" to a gateway that compresses and packetizes, because the specification's description of the "present invention" stated that "[t]he gateway compresses and decompresses voice frequency communication signals and sends and receives the compressed signals in packet form via the network." *Id.* at 1308. The court rejected the patentee's argument that this was merely "one aspect" of the invention, precisely because that aspect was "the very claim term that is at issue." *Id.* at 1308 n.8. So too here.

CPT does not seriously contest that these passages describe the invention as a whole (Resp. Br. at 15-16) but instead argues that the specification description at 3:34-38 does not require "the solderable surface to remain present and exposed in the finished package" (*Id.*). But that is precisely the point of the passage—any "solderable finish can be used, as long as the *solderability is not*

*deteriorated* by the processing conditions and allows storage for a sufficient period *between package assembly and customer use*." 3:34-38. CPT recognizes that this passage discusses material selection, but the passage goes on to describe that the selection must allow the *solderability* to be preserved between *package assembly* and *customer use*. This clearly supports that the underside conductive surface must remain *solderable* through the packaging process and exposed to the customer for use. CPT also argues that claims 1 and 3 "stop short of any completed package." Resp. Br. at 16. But the point is not whether the solderable conductive surface must remain exposed at all times during the packaging process—the point is whether the claimed process is directed to producing an exposed die clip package as required by the invention. Claim 4—an asserted claim— confirms that it does, adding "removing the temporary carrier" after encapsulation, confirming the temporary carrier is removed to expose the die's solderable underside in the finished package. CPT's reading violates the purpose of the invention. Ex. C at 1:49-54. The Court should adopt ST's construction.

### 3. "mounting . . . dispensing . . . attaching . . . and reflowing . . ." (Claims 1, 3, and 4)

Although CPT contends no construction is necessary, CPT concedes at least two of the four steps must be performed in order. Resp. Br. at 17. CPT admits that the mounting and dispensing steps must occur before the attaching step, while disputing that mounting must occur before dispensing and attaching must occur before reflowing. As there is no dispute as to at least the ordering that CPT concedes, the Court should at a minimum construe this term to require "(1) mounting . . . dispensing . . . (2) attaching . . . and reflowing, where the mounting and dispensing steps must occur before the attaching and reflowing steps."

As to the remaining disputes as to ordering, CPT argues the claim does not require mounting before dispensing. But the dispensing step recites dispensing solder paste "onto the bond pads on the plurality of active device die"—language that presupposes the die (and their bond pads) are

already in their predetermined positions on the carrier. CPT next argues there is no requirement "attaching must be fully complete before any reflowing can begin." But the attaching step requires "solder paste" to be present on the bond pads, while reflowing the solder involves converting the paste into a solid so that "a connection is made." Reflowing cannot logically begin before the attaching step positions the lead frame portions in contact with the solder paste on the bond pads. Contrary to CPT's suggestion, ST does not rely solely on the specification's process flow to command a sequence of steps. ST relies on the sequence of those steps as a manufacturing process that logically requires the step before it to be completed before the next step can begin. In addition, while CPT criticizes the Examiner's reasons for distinguishing the art, CPT's brief acknowledges that the examiner relied at least in part on the sequence of steps to allow the claims. Resp. Br. at 18-19. ST does not rely on the examiner's findings for disclaimer; ST relies on them to show how one of skill in the art would understand the claim. *Salazar*, 414 F.3d at 1347. The Court should enter ST's proposed construction for this term.

### D.    U.S. PATENT 8,643,189

#### 1.    "power rail pad" (Claims 1, 13, 14, and 19)

The parties agree that a "power rail pad" refers at least in part to a "conductive pad," and CPT does not dispute that it "supplies power to circuit nodes of the die." Resp. Br. at 19-22. And while the parties agree that the power rail pad must be "on the die connection pad surface," ST submits that it is already an express requirement of the claim. CPT's construction is therefore redundant. The parties' main dispute is whether the power rail pad must be "not integrated with the die circuitry" as required by ST's proposal. The intrinsic record dictates that it must, and CPT offers no persuasive reasoning to the contrary.

CPT offers various reasons opposing ST's proposed construction but each fails. As to lexicography, ST's opening brief showed that while the specification uses permissive "*may*"

language to describe various optional features of the claimed "power rail pad," the specification uses *mandatory* language to define what the power rail pads *are*: power rail pads "*are* non-circuit nodes" and "*are not* integrated nodes of the circuitry within the semiconductor die 301." Ex. D, 4:26-31. CPT attempts to distinguish *Sinorgchem* on the basis that the specification does not use quotation marks to define "power rail pads," but *Sinorgchem* did not establish a litmus test for lexicography. *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007). Rather, *Sinorgchem* treated quotation marks as *one* indicator and then relied *separately* on the definitional verb "is" as a signal of lexicography. *Id*. Contrary to CPT's position, "such rigid formalism is not required" and a "term may be clearly redefined without an explicit statement of redefinition." *AstraZeneca AB v. Mut. Pharm. Co.*, 384 F.3d 1333, 1339 (Fed. Cir. 2004). Here, the use of mandatory "*are*" and "*are not*" language in the presence of other optional language "*may*" to describe optional features is a strong indicator that the not integrated language is definitional, particularly where the patentee itself pointed the Examiner to that exact definitional language to obtain allowance. Ex. G at 76. CPT has no answer for the specification's mandatory/permissive contrast nor for the patentee's reliance on this mandatory language during prosecution. Ex. G at 76.

CPT's criticism of the "not integrated" language is similarly unpersuasive. CPT criticizes ST's proposal as not matching the specification's language exactly, but points to no difference in meaning. CPT's concerns about juror confusion are similarly unfounded. The term "integrated" is a well-known term of art, and no one intends to argue this term means the power rail pad is *not electrically connected*—the claim clearly requires "die wire bonds electrically coupling the power rail pad to at least two of the die connection pads." The import of "not integrated" is reasonably clear—the specification describes that power rail pads are not integrated within the die circuitry but are instead "mounted on the die connection pad surface 303 by an epoxy or other form of adhesive."

Ex. D at 4:10-16. Regardless, the mere invocation of potential juror confusion (there is none) is insufficient to override the clear definitions recited above and relied on in prosecution.

Finally, CPT's argument that claim differentiation dictates a different result is unfounded. Resp. Br. at 20. CPT fails to acknowledge controlling authority. Claim differentiation "does not serve to broaden claims beyond their meaning in light of the specification, and does not override clear statements of scope in the specification and the prosecution history." Op. Br. at n.6 (quoting *Fenner*, 778 F.3d at 1327). Claim differentiation cannot override the intrinsic record's mandatory statements that power rail pads are not integrated nodes of the die circuitry. For these reasons, the Court should adopt ST's construction.

### 2.    "opposite die connection pad surface" (Claims 1, 13, 14, and 19)

The parties agree that this term refers to the surface of the die "opposite to—i.e., on the other side of—the 'mounting surface.'" Resp. Br. at 22. ST's proposed construction is the plain meaning and will aid the juror's understanding. This is also the exact phrase patentee used to explain the meaning of this term in prosecution. Ex. G at 74 (describing that "die 301 has . . . an opposite die connection pad surface 303 (top, active surface)"). While CPT contends the patentee was merely describing "a particular embodiment," CPT overlooks that these words were used to describe the "*present invention*" during prosecution. *Id.* There, the patentee said, "*the present invention is directed to a semiconductor die package 300 . . .*" and described "opposite die connection pad surface (*top, active surface*)" as part of that invention. *See Luminara Worldwide, LLC v. Liown Elecs. Co. Ltd.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016) (the patentee's use of "the present invention is" to describe invention is limiting). The Court should adopt ST's proposal.

## III.    CONCLUSION

ST respectfully requests the Court adopt ST's proposed constructions and expressly reject CPT's proposals.

Dated: August 4, 2026

Respectfully submitted,

*/s/ Jeffery S. Becker*
Jeffery S. Becker
jeff.becker@bakerbotts.com
Tel: (214) 953-6526
Fax: (214) 661-4526
Nolan Edward Sullivan McQueen
nolan.mcqueen@bakerbotts.com
Tel: (469) 236-5024
Spencer Nayar
spencer.nayar@bakerbotts.com
Tel: (214) 600-3719
**BAKER BOTTS LLP**
2001 Ross Avenue, Suite 900
Dallas, TX 75201

*Attorneys for STMicroelectronics, Inc*.

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record are being served with a copy of the foregoing document via the Court's CM/ECF system on August 4, 2026.

By: */s/ Jeffery S. Becker*_____
Jeffery S. Becker